# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP2733-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>              Plaintiff-Respondent-Petitioner,<br>      v.<br>Minerva Lopez,<br>              Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(No Cite)

| | |
|---|---|
| OPINION FILED: | March 7, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 3, 2013 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Nicholas J. McNamara |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | PROSSER, GABLEMAN, JJ., concur. (Opinion filed.) |
| DISSENTED: | ABRAHAMSON, C.J., dissents. (Opinion filed.)<br>BRADLEY, J., ABRAHAMSON, C.J., dissent. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner, the cause was argued by *Aaron O'Neil*, with whom on the briefs was *J.B. Van Hollen*, attorney general.

For the defendant-appellant, there was a brief by *Patricia A. FitzGerald*, Mount Horeb, and oral argument by *Patricia A. FitzGerald*.

No. 2011AP2733-CR
(L.C. No. 2008CF1835)

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

STATE OF WISCONSIN           :        IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent-Petitioner,**

    **v.**

**Minerva Lopez,**

    **Defendant-Appellant.**

**FILED**

**MAR 7, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1    ANNETTE KINGSLAND ZIEGLER, J.    This is a review of an unpublished decision of the court of appeals, State v. Lopez, No. 2011AP2733-CR, unpublished slip op. (Wis. Ct. App. Sept. 26, 2012), reversing the Dane County Circuit Court's[1] denial of Minerva Lopez's ("Lopez") presentence motion to withdraw her pleas.

¶2    We address how appellate courts should review a circuit court's denial of a defendant's motion to withdraw a plea before sentencing.    In general "a circuit court should

---

[1] The Honorable Nicholas McNamara presided.

'freely allow a defendant to withdraw his plea prior to sentencing for any fair and just reason, unless the prosecution [would] be substantially prejudiced.'" State v. Jenkins, 2007 WI 96, ¶2, 303 Wis. 2d 157, 736 N.W.2d 24 (citing State v. Bollig, 2000 WI 6, ¶28, 232 Wis. 2d 561, 605 N.W.2d 199; see also State v. Rushing, 2007 WI App 227, 305 Wis. 2d 739, 740 N.W.2d 894).

¶3    The State does not argue that Lopez failed to present a fair and just reason to withdraw her pleas.[2]  Thus, our analysis in this case focuses on whether the circuit court erroneously exercised its discretion in concluding that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas.

¶4    Lopez contends that the State has not shown that it would be substantially prejudiced if she were allowed to withdraw her pleas.  She argues that the State offered no evidence that the victim is unable to testify or that the victim's memory has faded.  Lopez further asserts that the State failed to demonstrate that the case against Lopez would be more difficult to prove, and that, in fact, significant evidence against Lopez could still be admitted at trial.

¶5    The State contends that the circuit court properly exercised its discretion in determining that the State would be

---

[2] Lopez contended that her pleas were rushed, and that she entered her pleas unknowingly due to her limited English. Because the State conceded this issue, this opinion assumes, without deciding, that these facts constitute a "fair and just reason" for Lopez to withdraw her pleas.

substantially prejudiced if Lopez were allowed to withdraw her pleas.  The State argues that, because the victim is now over 16 years of age, allowing Lopez to withdraw her pleas would prevent it from presenting important audiovisual interviews of the victim at trial.  The State asserts that the circuit court was correct to conclude that the State would be substantially prejudiced because, without the audiovisual evidence, it would be more difficult for the State to prove its case, the victim's memory had faded during the pendency of the action, and it was in the best interests of the victim not to be forced to testify.

¶6   We hold that the circuit court did not erroneously exercise its discretion when it determined that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas.  We sustain the discretionary determination of the circuit court because the record reflects that it was "the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination."  State v. Canedy, 161 Wis. 2d 565, 580, 469 N.W.2d 163 (1991) (citations omitted).  Accordingly, we reverse the court of appeals.

## I.   FACTUAL ALLEGATIONS

¶7   In a trial against Lopez, the State would have to prove 22 felony counts of physical abuse of a child.  The State's burden of proof is the highest standard in the law, beyond a reasonable doubt.  The record reflects that the State would have sought to prove the facts alleged in the criminal

complaint in part, by using audiovisual interviews of the victim.  The State contends that it would be substantially prejudiced if Lopez were allowed to withdraw her pleas because it is now precluded from introducing video evidence under Wis. Stat. § 908.08(3) (2009-10)[3] as the victim is now over 16 years of age.  Thus, we turn to the factual basis for the allegations against Lopez and describe the audiovisual recordings at issue in this case.

¶8   On September 25, 2008, Madison Police Detective Robert Hale ("Detective Hale") was "dispatched to [an address] in the Town of Madison, Dane County, Wisconsin, in reference to a child abuse investigation."  Detective Hale was sent to investigate a report of "an emaciated female child in the closet . . . [with] some type of injury to her head."  Upon arrival, Detective Hale identified A.O., the primary victim in this case.  Detective Hale described the injuries to A.O. as follows:

> [Hale] immediately identified [A.O.][4] as a victim of a horrendous crime inasmuch as she was virtually covered from head to toe with bruises [and] with various bloody wounds to the top scalp of her head, an open gash to her right cheek, various generations of bruises ranging in color from purple to green to yellow, and injuries that were consistent with what [Hale] later found were breaks in her right hand and a broken right kneecap.

Detective Hale identified two suspects in the case, Lopez and Porfirio Olivas-Lopez ("Olivas"), the victim's parents.

---

[3] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

[4] The criminal complaint refers to the victim as "AOL."

4

¶9 After rescuing A.O. from her home, Detective Hale transported her to the University of Wisconsin Children's Hospital. Upon examination, A.O. was found to have "two breaks to the fingers of her right hand, one of which was an older break, the second of which was a newer break." A.O.'s broken right kneecap "was going to need surgical treatment."

¶10 A child abuse specialist concluded that "the multiple bruises and fractures present [on A.O.] are not consistent with any medical cause." The specialist also noted that A.O. "appeared malnourished," and was "potentially going to be suffering from life-long disabilities due to injuries sustained from the abuse, including but not limited to scarring resulting in permanent disfigurement and injuries leading to limb immobility." The specialist medically diagnosed A.O. with:

1. Definite physical abuse of a child.

2. Serial child torture.

3. Physical neglect of a child.

4. Medical neglect of a child.

5. Educational neglect of a child.

6. Consistent with causation of great mental harm.

¶11 On September 26, 2008, Detective Hale spoke with Lopez at the Town of Madison Police Department. During the discussion, which was conducted through the assistance of a State-certified English-Spanish interpreter, "Lopez admitted to causing the majority of the injuries sustained by [A.O.] and observed by Detective Hale." Lopez admitted to having "hit

[A.O.] on the head with a [broomstick]." "The broom was described as a metal broom, and it was bent from the attack."

¶12 The criminal complaint, filed October 2, 2008, relates that Detective Hale elicited further admissions from Lopez during the interview:

> When asked how often she would hurt [A.O.], [Lopez] said she would [use] Defendant Olivas' belt. She said that she used the belt on [A.O.'s] buttocks area. When asked if she ever punched [A.O.] with a fist, she said yes, and also said that she would slap [A.O.]. Detective Hale asked if [she] had ever bitten [A.O.] as [A.O.] looked like she had some bite marks on the inside of her legs. Lopez said that she did not bite her on the inside of her leg, and when asked where she did bite her, Lopez pointed to the right side of her face by the jaw line and said "Here." . . .
>
> Detective Hale asked her what the worst thing she had done to [A.O.] was, she responded by saying "Well, hitting her on the head." When asked if it was when she hit her on the head with the metal broom or other times, Lopez responded there were other times. When asked specifically what she used to strike [A.O.] on the head with, she said she once had used "a frying pan."

Lopez admitted that police would be able to identify the frying pan she had used to strike A.O. because "it got kind of dented on the bottom." When Detective Hale asked her how many times she had struck A.O. on the head, Lopez replied, "[l]ately it has been quite often."

¶13 Lopez also admitted to Detective Hale that she had poured hot water on A.O., and stated "'[y]eah, it was hot from being on the stove and we were both in the kitchen and she wasn't hurrying enough.'" Lopez continued by saying that she

6

would "'lose it' and have this 'stupid reaction,' saying 'I threw it on her clothes' with [A.O.] responding 'You're burning me, you're burning me.'"

¶14 Detective Hale also asked if Lopez had ever cut A.O. with a knife. Lopez said that, in fact, "she had used a knife to cut [A.O.] with. . . . When asked if [A.O.] screamed, she said yes. When asked if there was a lot of blood, she said 'Yes.'"

¶15 When asked what other ways she abused A.O., Lopez admitted to strangling her. "[Lopez] said 'Be quiet, be quiet or I'll make you be quiet.' At that point, she would press down on [A.O.'s] neck . . . . Lopez said that she would leave red marks on [A.O.'s] neck and that those would go away and then bruises would come later." Lopez noted that A.O. would try to defend herself, but "'[t]hat would make me angrier and I would just say to her, you're not going to beat me.'"

¶16 On October 6, 2008, and again on October 16, 2008, A.O. gave statements about her abuse in the form of recorded audiovisual interviews.[5] In these audiovisual recordings, A.O. recounts detailed descriptions of the abuse. The circuit court reviewed the audiovisual recordings as part of its determination of whether the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas.

---

[5] Any audiovisual recordings beyond these two are not the subject of this court's review.

¶17 In the audiovisual recordings, A.O. related how Lopez hit her on the knee "with a metal baseball bat" on the day that she was rescued.[6] A.O. gestured to her fully braced and immobilized right leg while she said "it hurt a lot" and that she was barely able to walk. Subsequent medical diagnosis revealed that her kneecap had been broken.

¶18 A.O. described that, three days before the attack with the bat, Lopez hit her twice in the back of the head with a piece of metal tube from a scooter, tearing her scalp. A.O. pointed to the location of the injury to her scalp and described that she was "bleeding a lot" and that she had to clean her own bloodstains out of the carpet. A.O. then described a "piece of flesh" detaching from her scalp while in the bath and being able to "feel a hole" in the back of her head. A.O. also related that Lopez refused to seek medical attention for A.O.'s injuries.

¶19 About "three weeks" before the interviews, A.O. further described seeing that Lopez "had something behind her back," so she knew that Lopez "had something to hit me with." Lopez hit her in the face with the metal bar from a drawer, causing what A.O. described as a "hole" underneath her eye. A.O. pointed to the dark circle under her eye. A.O. said that Lopez forced her to wear "dark glasses and [her] hat" in public to conceal the injury.

_____

[6] All quotations from the audiovisual recordings are A.O.'s own words, as translated in the audio track of the recording.

¶20 A.O. also described an attack, which occurred approximately four weeks before the interviews, where Lopez choked A.O. for accidentally dropping pizza on the floor during dinner. A.O. lost consciousness and "peed her pants." According to A.O., Lopez stopped the attack because she feared that the "pigs would be here any minute." A.O. was then forced to "stand in the corner [of her parents' bedroom] for the whole night." As A.O. began to fall asleep, Olivas threw ice water on her face.

¶21 A.O. described "being careful to make sure teachers didn't see the bandages" as she pointed to scars on her wrists from Lopez cutting her with a kitchen knife. She recalled that Lopez cut her so deep "it opened me up [to where] I could see white, and I said 'it's my bone.'" A.O. recalled that Lopez would "sometimes throw the knife at me." Lifting up her shirt, A.O. showed scars left when the knife hit her.

¶22 A.O. related that if Lopez noticed "that the frying pan had a little speck of beans on it" after A.O. did the dishes, Lopez would hit her on the head with the pan. This abuse occurred "about five times." Because of being struck in this way, the handle of one pan broke off, while another became "bent." A.O. described that these beatings caused her "a lot of pain, and [she] felt like something burst."

¶23 A.O. described an instance when she was crying as a result of the repeated beatings and Lopez "bit her on the face" in an effort to get her to "shut up before someone hears." Lopez left "teeth mark bruises" on A.O.'s skin.

9

## II.  PROCEDURAL HISTORY

¶24 On October 2, 2008, the State filed a criminal complaint against Lopez, and she made her initial appearance with counsel.  Lopez's bail was initially set at $25,000 cash. The criminal complaint, which also served as the factual basis for Lopez's eventual pleas, alleged 27 separate counts against Lopez and Olivas for the physical abuse A.O. suffered.  The complaint included 25 counts of intentionally causing bodily harm to a child, contrary to Wis. Stat. § 948.03(2)(b) (2007-08), a class H felony, and two counts of intentionally causing great bodily harm to a child, contrary to § 948.03(2)(a) (2007-08), a class C felony.  Lopez was charged with 16 of the 27 counts, including both counts of causing great bodily harm.

¶25 On October 8, 2008, the State notified Lopez of its intent to use the October 6 audiovisual recording of A.O. at trial under Wis. Stat. § 908.08.[7]  The notice came just six days

---

[7] Wisconsin Stat. § 908.08 provides, in relevant part:

> (1) In any criminal trial or hearing . . . the court or hearing examiner may admit into evidence the audiovisual recording of an oral statement of a child who is available to testify, as provided in this section.

> (2)(a) Not less than 10 days before the trial or hearing, or such later time as the court or hearing examiner permits upon cause shown, the party offering the statement shall file with the court or hearing officer an offer of proof. . . . That party shall give notice of the offer of proof to all other parties, including notice of reasonable opportunity for them to view the statement before the hearing under par. (b).

after Lopez's initial appearance and two days after the interview was recorded. At the time A.O. was 14 years old. The State filed a similar notice relating to the October 16, 2008 audiovisual recording on July 3, 2009.

¶26 On October 9, 2008, Lopez, represented by a different attorney, waived her right to a preliminary hearing and was bound over for trial. On November 3, 2008, Lopez was arraigned on the Information, which charged Lopez and Olivas with 49 counts of felony child abuse. Lopez entered pleas of not guilty and not guilty by reason of mental disease or defect. On December 1, 2008, an Amended Information was filed, which added penalty enhancers to certain counts for use of a dangerous weapon.

¶27 On December 4, 2008, the State and Lopez filed a "Stipulation and Agreement Regarding Audiovisual Recording." The agreement acknowledged that "the State has provided the defense with a copy of an audiovisual recording of a child." The parties agreed that "neither party will make additional copies of the videotaped statement, nor will either party allow additional copies to be made by any other entity or individual."

¶28 On January 27, 2009, Lopez's attorney filed a motion to withdraw from representation. In the motion, counsel stated that he was seeking to withdraw at the request of Lopez. On January 29, 2009, the court granted the motion to withdraw. On February 6, 2009, the State Public Defender appointed a new attorney for Lopez.

11

¶29 On March 23, 2009, the court held a status conference in the case. The court set a trial date of July 14, 2009.

¶30 On April 10, 2009, Lopez's attorney filed a motion to withdraw from representation because Lopez "no longer wants me to represent her." The court granted the motion to withdraw the same day.

¶31 On June 19, 2009, Lopez, now represented by a third attorney, filed a motion to sever her trial from Olivas'. On June 23, 2009, the court held a hearing and granted Lopez's motion to sever, concluding that there was a possibility that Lopez and Olivas would pursue "mutually antagonistic" defenses. After granting Lopez's motion, the court kept the July 14 trial date for Olivas,[8] but did not set a trial date for Lopez due to a pending plea offer.

¶32 On July 22, 2009, Lopez's third attorney filed a motion to withdraw as Lopez's counsel. Counsel noted that Lopez had written to both the public defender's office and to the court requesting new appointed counsel. Counsel argued that "[t]his matter currently has no dates scheduled for trial and neither Ms. Lopez nor the state will be prejudiced by any delay in appointment of new counsel."

¶33 On July 31, 2009, the court[9] held a hearing on the motion to withdraw and stated:

---

[8] Olivas' trial date was later postponed to December 1, 2009.

[9] The Honorable Stuart Schwartz presided over both this hearing and the September 18, 2009 motion hearing.

12

There is nothing in the law that says the defendant has to like her attorney. What the defendant is entitled to under the law is effective representation and counsel who is diligent in pursuing in this case his obligations as it relates to Ms. Lopez.

You, [Counsel], are the third attorney who's been on this case. As I listened to Ms. Lopez's comments, half of her comments had to do with her background and her upbringing and had nothing to do with whether or not she could get along with you for purposes of representation.

¶34 At the motion hearing, the State referenced the need to timely proceed. Indeed, the court referenced the potential prejudice to the State if the trial did not occur before A.O. turned 16 years old:

The State has made reference to the potential prejudice that it runs into in this matter. I realize May of next year is still ten months away. But, at that point in time, the alleged victim in this matter would be turning sixteen, which would impact on the use of the Safe Harbor tapes. Also, we are talking here about a child who was fourteen when these events allegedly occurred, which means this case has been pending over and hanging over the head of this child for a substantial period of time.

The court then evaluated Lopez's arguments and indicated it was unwilling to allow counsel to withdraw and delay the matter further:

I don't see the delay here being for really any legitimate purpose. . . .

I don't see that there's been an argument presented here that allows me to say that counsel has done anything other than act professionally in this matter. The fact that Ms. Lopez may not like what she hears is not counsel's fault.

. . .

13

I don't find any basis here to allow counsel to withdraw, and I'm going to deny the motion.

¶35 On August 13, 2009, the court held a scheduling conference. Lopez's trial was set for December 15, 2009, with a motion hearing to be held in September.

¶36 On September 18, 2009, the court heard various motions, including the State's motion to admit the audiovisual recordings of A.O. at trial. Prior to the court's ruling, Lopez's attorney briefly asked how the State planned to use the recordings:

> [DEFENSE COUNSEL:] Is it their intention to try to use those instead of live testimony?
>
> THE COURT: No. I don't think the law allows that.
>
> [THE STATE:] No. We use -- We use the tapes in conjunction with live testimony.
>
> THE COURT: That's what I said. I don't think the law allows that. At preliminary hearing --
>
> [THE STATE:] Yes.
>
> THE COURT: But not for purposes of the trial.
>
> [THE STATE:] No. The witness will be on the stand and we'll play it.
>
> [DEFENSE COUNSEL:] Then I guess to the extent that it would be a prior consistent statement, if there is those kind of challenges to the testimony, I think it would be appropriate under that theory. But, I just don't understand what they're going to gain out of it, if the witnesses are going to show up in court and testify as one would expect.

¶37 The court immediately clarified, however, that it was addressing the State's motion to admit the audiovisual

14

recordings under Wis. Stat. § 908.08, and not as a prior consistent statement:

> We're talking here about audio visual recordings of a statement of a child coming in under 908.08 of the statutes.
>
> More specifically, the statute indicates under the law that in this particular case, the audio visual statement can be used before the child's 16th birthday and if the interests of justice warrant its admission under subsection (4) of the statutes.[10]

---

[10] Wisconsin Stat. § 908.08(4) provides:

(4) In determining whether the interests of justice warrant the admission of an audiovisual recording of a statement of a child who is at least 12 years of age but younger than 16 years of age, among the factors which the court or hearing examiner may consider are any of the following

(a) The child's chronological age, level of development and capacity to comprehend the significance of the events and to verbalize about them.

(b) The child's general physical and mental health.

(c) Whether the events about which the child's statement is made constituted criminal or antisocial conduct against the child or a person with whom the child had a close emotional relationship and, if the conduct constituted a battery or a sexual assault, its duration and the extent of physical or emotional injury thereby caused.

(d) The child's custodial situation and the attitude of other household members to the events about which the child's statement is made and to the underlying proceeding.

(e) The child's familial or emotional relationship to those involved in the underlying proceeding.

[A.O.] is fifteen now, I believe. So, she meets the first criteria.

¶38 The court then granted the State's motion and deemed the audiovisual statements admissible, citing to the statutory factors of Wis. Stat. § 908.08(4):

If you look at subsection (4), it indicates that in determining whether the interests of justice warrant the admission of an audio visual recording of a statement of a child who is at least 12 years of age but younger than 16 years of age, there are various factors the Court looks at. The child's chronological age, the level of development, capacity to comprehend the significance of the events and to verbalize about them.

(f) The child's behavior at or reaction to previous interviews concerning the events involved.

(g) Whether the child blames himself or herself for the events involved or has ever been told by any person not to disclose them; whether the child's prior reports to associates or authorities of the events have been disbelieved or not acted upon; and the child's subjective belief regarding what consequences to himself or herself, or persons with whom the child has a close emotional relationship, will ensue from providing testimony.

(h) Whether the child manifests or has manifested symptoms associated with posttraumatic stress disorder or other mental disorders, including, without limitation, reexperiencing the events, fear of their repetition, withdrawal, regression, guilt, anxiety, stress, nightmares, enuresis, lack of self-esteem, mood changes, compulsive behaviors, school problems, delinquent or antisocial behavior, phobias or changes in interpersonal relationships.

(i) Whether admission of the recording would reduce the mental or emotional strain of testifying or reduce the number of times the child will be required to testify.

16

I've viewed the video tapes, as I've indicated, in this matter. Although the child does have the capacity to verbalize about them, my sense of recollection from looking at those tapes was that she was, first of all, more comfortable talking in Spanish than she was in English regarding these. She certainly has chronological age and level of development, capacity to understand the significance of the events.

She seemed to be, despite the allegations that were put forth by the State and as a result of what I saw on the tape, physically and mentally healthy enough to testify both in person and as was presented on the tape, particularly since she's now been living in a different environment.

The events about which this child's statement is made certainly constitute, assuming she is believed, the criminal or antisocial conduct perpetrated against the child. And that [A.O.] had a close emotional relationship with the defendant in this matter. And the conduct constitutes a battery at a minimum, and the allegations clearly are physical abuse. And its duration and the extent of that are set forth in the tape.

I think that it's also fairly clear here that the child's emotional relationship to those involved in the underlying proceeding were set forth in the tape. Her behavior or reaction to the previous events that occurred to her were all set forth in the tape.

There are other considerations set forth in the statute that I did take into account as well. The child's behavior, attitude, demeanor during the course of the interview I took into account. How the child responded to various questions. And when I say how, I don't mean the substance of the answers other than that they were related to the questions that were asked but whether or not she seemed hysterical or straightforward in her presentation, things of that type. Whether or not she evinced any signs of fear, guilt, anxiety, stress and so forth.

I found the tapes to be pretty much straightforward. They were interviewed. The person conducting the interview attempted to put [A.O.] at

17

ease as much as possible.  Explained the purpose of the proceedings.   [A.O.] clearly understood the difference between truth and lying.  She will be testifying as well in this matter.

I believe that under the considerations that the Court needs to look at, that allowing the audio visual tapes to be introduced is appropriate.  However, [A.O.] would need to testify first.  And I believe these tapes then come in under 908.01 sub (4)(a)2, which provides that a prior consistent statement of a witness is not hearsay if the declarant testifies at trial and is subject to cross-examination; the statement is consistent with the declarant's testimony, which I assume it will be; and the statement is offered to rebut any express or implied charge against the declarant of a fabrication or improper influence or motive.

In addition to being allowed by statute, there is case law that allows the tapes to be used in that regard.   I would simply note to the parties that one of the more recent cases was Ansani vs. Cascade Mountain, Inc., at 223 Wis. 2d 39.   That's a 1998 case.

The videotape also, as I've indicated, clearly shows the understanding on the part of the child regarding the importance of telling the truth and that the content, circumstances of the statement contained within the tape on their face provide an indicia of trustworthiness.

So, I'll allow the videotape to come in.

¶39  On November 19, 2009, Lopez pled no contest to six of the 22 counts against her.[11]  The remaining counts were dismissed

---

[11] While there is no indication in the record that Lopez's testimony at Olivas' trial was part of her plea agreement, she did admit to physically abusing A.O. in her testimony.  The State described Lopez's plea agreement as "substantially the same offer that has been available to her since the middle of summer [2009]. It's just that now she wishes to accept it . . . ."

18

but read in pursuant to her plea agreement. The court accepted Lopez's pleas and ordered a presentence investigation report ("PSI").

¶40 On December 2, 2009, both Lopez and A.O. testified against Olivas at his trial.[12] The State presented the audiovisual recordings of A.O. as evidence against Olivas. On December 4, the jury returned a guilty verdict against Olivas on 21 counts and found him not guilty on three.

¶41 On March 9, 2010, the PSI for Lopez's sentence was filed with the circuit court. The PSI recommended a maximum term of 37 years imprisonment with between 22 and 25 years of initial confinement to be followed by 12 years of extended supervision. Further, the PSI described an "Anticipated Supervision Plan" that would preclude Lopez from having contact with any of her five children.

¶42 On March 18, 2010, Olivas was sentenced to 57 years imprisonment, with 20 years of initial confinement to be followed by 37 years of extended supervision.

¶43 On March 19, 2010, Lopez moved the court pro se to withdraw her pleas. On March 22, Lopez's third attorney petitioned the court a second time to be allowed to withdraw as Lopez's counsel. This time counsel argued that, because he had advised Lopez to accept her plea agreement, her motion to

---

[12] The Honorable Stephen E. Ehlke presided over Olivas' trial and subsequent sentencing.

19

withdraw her pleas placed her "in a posture essentially adversarial to counsel."

¶44  On March 23, 2010, the court held a hearing on Lopez's pro se motion to withdraw her pleas.  The court addressed the standard to be applied to Lopez's motion:

> I have concluded based on our discussion here on the record, and my review of the case law, that we will have to have a specific hearing to give the defendant an opportunity to present evidence in support of her motion to withdraw.  If she doesn't present evidence supporting that, it would essentially have to be denied outright.  If she has evidence, then the burden shifts back to the State I think on whether or not the State is prejudiced.  And if the State presents evidence of prejudice to them as a result of the plea that was entered and now asked to be withdrawn, then Ms. Lopez would have to produce evidence rebutting the prejudice, or the alleged prejudice.  And I think necessarily given the substance of what Ms. Lopez is apparently alleging in her filing just recently, it may well be that [Counsel] would have to be a witness.  So we're going to do this in steps.

The court then addressed Lopez's attorney's petition to withdraw as counsel:

> I think I have to grant -- I will grant [Counsel's] motion to withdraw as counsel.  We're going to have a status conference on April 6th, which was the date that we had scheduled for the sentencing hearing.  That will be a status conference hopefully with new counsel for Ms. Lopez.

¶45  On April 6, 2010, the court held a status conference. Lopez was represented by her fourth appointed attorney.  Counsel requested 30 days to prepare to argue Lopez's motion to withdraw her pleas.  The court agreed and scheduled a hearing for May 4, 2010.

20

¶46 On May 4, 2010, the court held the hearing on Lopez's motion to withdraw her pleas. At the outset, counsel requested that he be allowed to withdraw as Lopez's attorney because she had expressed that "she doesn't want me to proceed on this case." The court considered the significant delay, denied counsel's request, and stated:

> This is clearly at this point reaching absurdity and obvious delaying and obstruction. [Counsel's] retention is limited. The question, the only question that we're addressing today is the motion to withdraw Ms. Lopez' pleas. And if she has a fair and just reason to withdraw those pleas, then the burden will shift to the State to prove whether they would be substantially prejudiced by allowing her to withdraw the pleas. There's no reason why counsel and the defendant shouldn't be ready for this hearing today. The Court granted them exactly the time that they requested to be ready for this. Again, it's a very limited inquiry right now and I'm not about to allow Ms. Lopez to dismiss her fourth attorney and try to have a fifth one appointed. Not at this stage, not at this time, and not for the reasons cited, not any of those are adequate by either counsel or Ms. Lopez. So the motion to withdraw is denied.

¶47 The court then addressed Lopez's motion to withdraw her pleas and heard testimony from Lopez and her former attorney concerning the circumstances of Lopez's plea agreement.[13] On May 11, 2010, Lopez's attorney filed a formal motion to withdraw her pleas.

---

[13] The testimony on May 4, 2010, went to showing whether Lopez entered her pleas "knowingly, intelligently, and voluntarily." The parties did not address the fair and just reason for Lopez's plea withdrawal or the substantial prejudice to the State until May 18.

21

¶48 On May 18, 2010, the court reconvened the continued motion hearing to determine if Lopez knowingly, intelligently, and voluntarily pled, and if so, whether she should be allowed to withdraw her pleas. The State introduced Lopez's plea questionnaire and waiver into evidence. The State also called Detective Hale to testify with respect to the substantial prejudice the State would face should Lopez be allowed to withdraw her pleas:

DIRECT EXAMINATION BY [THE STATE]:

Q    Good afternoon, Detective.

A    Good afternoon.

Q    Please state and spell your name for the record.

A    It's Robert J. Hale, H-a-l-e.

Q    Detective Hale, what is your occupation?

A    I'm a detective for the Town of Madison Police
     Department.

Q    What is your connection to this case?

A    I was the lead detective investigating the crime.

Q    Did you interact with the victim in this case?

A    Yes, on numerous occasions.

Q    Or more specifically the victim [A.O.]?

A    That's correct, yes.

Q    When did you first meet her?

A    I met her on the initial call back in, I believe
     '08, October, I think of '08. It was in '08 when
     the case was reported.

Q    I think it was September.

22

A   September, sorry.

Q   How did you find her at that time, in what condition?

A   I won't forget that. I found her coming out of a bathroom, trying to coax her out of the bathroom and saw her in a horrible, horrible condition. She was emaciated, weak, full of blood. She was just -- she was just a mess. I likened her to a, dare I say, Holocaust victim, just completely beaten up and fragile.

Q   Sometime after that [A.O.] was interviewed at Safe Harbor; is that correct?

A   Yes, that's correct.

Q   Do you recall how long after you first met her that interview took place?

A   I don't recall exactly. I'm surmising about two weeks.

Q   And how did she -- well, tell us please about that interview process and what happened there?

[DEFENSE COUNSEL:] Your Honor, I'm going to object. I think we're getting far away from the focus of this motion.

[THE STATE:] Actually --

[DEFENSE COUNSEL:] We -- it's an attempt to re-try the case, or try the case I should say.

¶49 The court clearly considered the substantial prejudice prong of the analysis, and stated:

THE COURT: Well, the State does have the burden to establish substantial prejudice. I would assume that that's what this testimony is going to. I'm not sure it's -- I mean, for the record as I mentioned at our last hearing I have actually viewed the Safe Harbor tapes. I've read the transcripts as I was viewing them. So in terms of content goes I do agree with [Counsel] that I'm not sure all of that's really necessary.

23

[THE STATE:]  That being the case, Judge, I would ask then, Judge, that you take judicial notice of the fact that the Safe Harbor tape was used in evidence at [Porfirio] Olivas' trial, that a recorded copy is part of the record in this case along with a transcript, and that as you indicated that you have reviewed both.

THE COURT: Okay.  Any objection to me taking judicial notice of those items, particularly the transcript, which is really the best documentary piece of evidence we have, of what I actually viewed and read?

[DEFENSE COUNSEL:]  No, sir.

THE COURT:  Okay.  I will take judicial notice of that and for purpose of this hearing the tape and the transcript of the Safe Harbor tape are part of this record.

¶50 After hearing the evidence and testimony, the court briefly recessed and then reconvened to hear argument from counsel:

We're going to go back on the record.  And I'm prepared to hear summary arguments now from counsel. I'm still -- as I said at the last hearing I'm still viewing this as essentially three separate issues. The first is whether the plea by Ms. Lopez was entered knowingly, intelligently and voluntarily.  The second is whether she has a fair or just reason to withdraw her plea.  And the third would be considering whether the State has proven substantial prejudice if she were to be allowed to withdraw her plea.

¶51 Lopez's counsel first argued that Lopez's pleas were deficient.  Next, he argued that Lopez's desire to put on a mental disorder defense, which she claimed was never addressed by her prior attorneys, constituted a fair and just reason for withdrawal of her pleas.  Finally, counsel argued the subject of this appeal——whether the State showed substantial prejudice:

24

[DEFENSE COUNSEL:] And as far as a substantial prejudice to the State, they have tapes on most of this evidence. They've been through this evidence once, that makes it the second time even easier. So the prejudice to the State I think is minimal. All present -- all witnesses are available. There are transcripts, as I said videotape testimony, so the argument that this would be an undo [sic] burden to re-try -- or to try this case, I think that evidence doesn't hold up. That argument doesn't hold up.

THE COURT: And do you acknowledge that under Section 908.08(3) that the State would not be allowed to use the Safe Harbor tapes at trial in this case?

[DEFENSE COUNSEL:] Because of the age?

THE COURT: Yes.

[DEFENSE COUNSEL:] I believe that would be the case.

¶52 The State then argued against Lopez's plea withdrawal. The State first contended that Lopez's pleas were entered knowingly, intelligently, and voluntary. The State then asserted that Lopez had presented no fair and just reason for her plea withdrawal. Rather, the State argued that Lopez merely "desire[d] to have a trial," which is insufficient under Wisconsin law. Finally, the State addressed how it would be substantially prejudiced by Lopez's plea withdrawal:

If in the alternative the Court were to find that Ms. Lopez has shown a fair and just reason to withdraw her plea, there is the next prong of analysis. The burden shifts to the State to show that the State would be substantially prejudiced by allowing the withdrawal of this plea. And the seminole [sic] case on the matter is State v. Bollig, I gave the citation earlier, that says that's the case and if Ms. Lopez were able to withdraw her plea the State would indeed be substantially prejudiced because central to this trial and central to the evidence in this case are the video recorded statements taken by detectives at Safe

25

Harbor of [A.O.], the principal victim, though not the only victim in these charges, the principal victim in these charges.

She was 14 years old at the time that she was found. She was interviewed days after she was rescued and the video recordings are now close to 20 months old. She was a child witness. And those video recordings are precluded from being admitted because she turned 16 a few days ago. Those video recordings are the most accurate testimony available of what happened of her view at that point in time. Over the nearly two years that have elapsed, or to be more accurate, 20 months that have elapsed since the recordings were made, memories do fade. Those recordings include the description of incidents that took place close to six months in some cases even before the recordings were made as the information alleges that some of this conduct was alleged to have taken place as early as April of 2008, so the incidents occurred as early as in some cases as two years ago.

Not only the issue of accuracy and accurate reflection of memory that is preserved in those tapes, but also those tapes are demonstrative of [A.O.'s] state, her physical state and her emotional state at the time that they were made. Her demeanor, which is essential to credibility determination, which is an essential function of course of a jury, or trier of fact, are lost if we cannot present those recordings. In those recordings she looks like a terribly abused child that she was. Fortunately for her now, she's doing very well and looks great and that's not the same presentation that would be made at trial at this point in time. It wouldn't accurately reflect how she appeared at the time and that is a substantial prejudice that the State would suffer.

¶53 Having heard argument from both parties, the court ruled on the motion. First, the court concluded that Lopez's pleas were entered knowingly, intelligently, and voluntarily. The court then addressed whether Lopez had presented a fair and just reason to withdraw her pleas. The court expressed concern

26

about Lopez's conduct, but in the end concluded that Lopez had shown a fair and just reason to withdraw her pleas:

> I'm confused on the record, I'm confused on this case generally as to whether at times Ms. Lopez misunderstands the proceedings or completely understands them and is using the process and the claim of misunderstanding to delay and frustrate the basic administration of justice here. She certainly did not expeditiously seek to withdraw her plea. She waited until the trial and conviction and sentencing of her husband. She waited until approximately ten days after the Court received the presentence investigation report with a recommendation for a sentence by the Department of Corrections. . . .
>
> Again, I think that's a really close call. I think kind of taking all of the circumstances together, the real language issues that Ms. Lopez obviously is dealing with and all of the other factors that are on the record, I think she probably has met that burden of proof and that she has proven by preponderance of the evidence a fair and just reason for me to allow her to withdraw her plea.

¶54 The court then concluded, however, that allowing Lopez to withdraw her pleas would substantially prejudice the State:

> But as in the Bollig case and many of the others, that conclusion does not end the [inquiries] as to whether the plea withdrawal should be granted. It then becomes the State's burden to prove that allowing the defendant to withdraw her plea would result in substantial prejudice to the State. The Bollig case is directly on point for that as well as a case called State v. Rushing, which is 305 Wis. 2d 739. It's a Court of Appeals case. The Rushing case also involved accusations of injuries to child, in this case it was, in the case of the Rushing that case it was a sexual assault and the defendant frequently changed his lawyers [sic]. The defendant changed his pleas at different times or attempted to and there was a videotape that was subject of the evidence against the defendant and was one of the reasons cited by the trial court and the Court of Appeals as to why the

27

State had shown substantial prejudice. In other words that they would be in that case not be allowed to use the tape.

In this case the Safe Harbor tapes taken of the victim [A.O.] are lengthy. If I remember correctly they're about three-and-a-half hours long. They are compelling. The testimony in the tape is credible. It's recent to when the events occurred. The testimony is specific. Clear. The age of the victim as reflected in the tapes is significant. And today if she was forced to testify of the passage of time from when the events occurred is significant here. I think this is an absolutely clear and easy call on my part to find that if the State was not allowed to use the Safe Harbor tapes it would result in substantial prejudice to the State.

I have to believe that part of [A.O.'s] therapy and recovery from everything that happened to her has included a need to forget somewhat, to move on, to move forward, to try to make the best of the future life in an attempt to overcome the harm that was done to her. If she is indeed successful in her recovery and therapy, then hopefully some of the things she's already forgotten. I hope for her sake that's the case. But because I think there's a real risk that she has, in fact, again just given the passage of time and the clarity and specificity of her testimony there's no way that she could ever be expected to reproduce the testimony she gave in the Safe Harbor tapes and she shouldn't be forced to, and so like the finding by the trial court in the Bollig case and the Rushing case that I referred to, because the State would face substantial prejudice to not be allowed to use the Safe Harbor tapes, the defendant's motion to withdraw her plea is denied.

¶55 On June 1, 2010, the court sentenced Lopez to 30 years imprisonment, comprised of 20 years of initial confinement to be followed by 10 years of extended supervision. Lopez moved for postconviction relief on September 1, 2011, and the court denied her motion on November 16, 2011. Lopez appealed.

28

¶56 A divided panel of the court of appeals summarily reversed in an unpublished opinion and order. Lopez, No. 2011AP2733-CR, unpublished slip op. at 2. The court of appeals agreed with the circuit court that Lopez had shown a fair and just reason to withdraw her pleas, but it held that that State would not be substantially prejudiced. Id. at 3. The court of appeals concluded that the circuit court had erroneously exercised discretion in denying Lopez's motion to withdraw her pleas. Id.

¶57 The court of appeals reasoned that the age limit in Wis. Stat. § 908.08(3)(a) is a legislative determination and, therefore, the limit cannot be prejudicial to the State. Id. at 4-5. The court of appeals also held that any assertion of faded memory on the part of A.O. was purely speculative and, therefore, the State did not meet its burden to show prejudice. Id. at 6. Finally, the court appeals concluded that the State was not substantially prejudiced because it could still use the video portion of the audiovisual recordings to show A.O.'s physical condition. Id.

¶58 Judge Paul Lundsten dissented. Id. at 7. He concluded that the circuit court properly exercised its discretion. He reasoned that the "loss of detail" that would result from excluding the audiovisual recordings would result in substantial prejudice. Id. at 7, 9. He concluded that there is "no requirement that the State prove that the prejudice be such that the State is substantially less likely to obtain a conviction." Id. at 10-11.

29

¶59 The State petitioned this court for review, which we granted on February 11, 2013.

### III. STANDARD OF REVIEW

¶60 "A decision to grant or deny a motion to withdraw [a plea] is within the discretion of the trial court." State v. Rhodes, 2008 WI App 32, ¶7, 307 Wis. 2d 350, 746 N.W.2d 599. "A circuit court's discretionary decision to grant or deny a motion to withdraw a plea before sentencing is subject to review under the erroneous exercise of discretion standard." Jenkins, 303 Wis. 2d 157, ¶30 (citing State v. Kivioja, 225 Wis. 2d 271, 284, 592 N.W.2d 220 (1999)). All that "this court need find to sustain a discretionary act is that the circuit court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." Id. (quoting Loy v. Bunderson, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982)).

### IV. ANALYSIS

¶61 "Withdrawal of a guilty plea before sentencing is not an absolute right." Jenkins, 303 Wis. 2d 157, ¶32 (citing Canedy, 161 Wis. 2d at 583). "[A] circuit court should 'freely allow a defendant to withdraw his plea prior to sentencing for any fair and just reason, unless the prosecution [would] be substantially prejudiced.'" Id., ¶2 (citing Bollig, 232 Wis. 2d 561, ¶28). "[T]he burden is on the defendant to offer a fair and just reason for withdrawal of the plea" by a preponderance of the evidence. Canedy, 161 Wis. 2d at 583-84. "[O]nce the defendant presents a fair and just reason, the

30

burden shifts to the State to show substantial prejudice so as to defeat the plea withdrawal." Bollig, 232 Wis. 2d 561, ¶34.

¶62 Because the State has conceded that Lopez has shown a fair and just reason for withdrawing her pleas, the burden is on the State to show that granting the withdrawal would cause it substantial prejudice. If the State meets this burden, Lopez "must rebut evidence of substantial prejudice to the State." Jenkins, 303 Wis. 2d 157, ¶43.

¶63 The State argues that it would be substantially prejudiced by Lopez's plea withdrawal in three ways. First, the State claims that its inability to introduce A.O.'s audiovisual recordings under Wis. Stat. § 908.08 constitutes substantial prejudice. Second, the State argues that A.O.'s faded memory as a witness constitutes substantial prejudice. Finally, the State asserts that it would be substantially prejudiced by the harm to A.O. that would result from forcing her to testify.

¶64 Lopez argues that the State has not shown that it would be substantially prejudiced if she were allowed to withdraw her pleas. She contends that the State offered no evidence that A.O. is unable to testify or that her memory has faded. Lopez asserts that the State did not show that it would be more difficult to prove its case and that, in fact, significant portions of the evidence could still be admitted at trial. Lopez also argues that the trial court did not actually find the audiovisual recordings admissible under Wis. Stat. § 908.08, but rather, erroneously found them admissible as prior consistent statements under Wis. Stat. § 908.01(4)(a)2. Thus,

Lopez argues that A.O.'s age is irrelevant to the evidentiary determination and therefore, substantial prejudice cannot result.

¶65 We conclude that the circuit court found the audiovisual recordings admissible under Wis. Stat. § 908.08, and did not erroneously exercise its discretion when it determined that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas.  Therefore, we reverse the court of appeals.

### A. Admission of A.O.'s Audiovisual Recordings

¶66 On October 8, 2008, just six days after the filing of the criminal complaint, the State provided notice to Lopez of its intent to use the audiovisual recordings of A.O.[14]  The State sought admission of A.O.'s audiovisual recordings as the "Audiovisual Recording of Child's Statement" pursuant to Wis. Stat. § 908.08.  Because A.O. was over 12 but under 16 years of age, the statute required that the circuit court find that the "interests of justice warrant" the admission of the recorded statement.  Wis. Stat. § 908.08(3)(a)2.  In weighing the admissibility of the recorded statement, the circuit court was required to consider the factors listed in § 908.08(4).

¶67 On September 18, 2009, the circuit court heard argument and deemed the audiovisual recordings admissible.  The

---

[14] At that time, only the October 6, 2008 recording had been made.  On July 3, 2009, the State provided notice to Lopez of its intent to use the October 16, 2008 recording.

court specifically referenced Wis. Stat. § 908.08(4) in granting the motion:

> We're talking here about audio visual recordings of a statement of a child coming in under 908.08 of the statutes.
>
> More specifically, the statute indicates under the law that in this particular case, the audio visual statement can be used before the child's 16th birthday and if the interests of justice warrant its admission under sub-section (4) of the statutes.
>
> [A.O.] is fifteen now, I believe. So, she meets the first criteria.

¶68 The circuit court began its discussion of how the audiovisual recordings met the requirements for admission by noting that the court had personally viewed the recordings:

> I've viewed the video tapes, as I've indicated, in this matter. Although the child does have the capacity to verbalize about them, my sense of recollection from looking at those tapes was that she was, first of all, more comfortable talking in Spanish than she was in English regarding these.

¶69 The court then discussed how the recordings satisfied Wis. Stat. § 908.08(4)(a):

> She certainly has the chronological age and level of development, capacity to understand the significance of the events.

¶70 The court went further, addressing her physical and mental health, as required by Wis. Stat. § 908.08(4)(b):

> She seemed to be, despite the allegations that were put forth by the State and as a result of what I saw on the tape, physically and mentally healthy enough to testify both in person and as was presented on the tape, particularly since she's now been living in a different environment.

33

¶71 The court also discussed the factors in Wis. Stat. § 908.08(4)(c), (d), and (e), including the alleged criminal assault by a family member and its emotional impact on A.O.:

> The events about which this child's statement is made certainly constitute, assuming she is believed, the criminal or antisocial conduct perpetrated against the child. And that [A.O.] had a close emotional relationship with the defendant in this matter. And the conduct constitutes a battery at [a] minimum, and the allegations clearly are physical abuse. And its duration and the extent of that are set forth in the tape.
>
> I think that it's also fairly clear here that the child's emotional relationship to those involved in the underlying proceeding were set forth in the tape. Her behavior or reaction to the previous events that occurred to her were all set forth as I looked at the tape.

¶72 The court also explained its consideration of Wis. Stat. § 908.08(4)(f), (g), and (h), and A.O.'s manifestations in the interview:

> There are other considerations set forth in the statute that I did take into account as well. The child's behavior, attitude, demeanor during the course of the interview I took into account. How the child responded to various questions. And when I say how, I don't mean the substance of the answers other than that they were related to the questions that were asked but whether or not she seemed hysterical or straightforward in her presentation, things of that type. Whether or not she evinced any signs of fear, guilt, anxiety, stress and so forth.

¶73 The court determined that the recordings were reliable and deemed them admissible:

> I found the tapes to be pretty much straightforward. They were interviewed. The person conducting the interview attempted to put [A.O.] at ease as much as possible. Explained the purpose of

34

the proceedings.   [A.O.] clearly understood the difference between truth and lying.   She will be testifying as well in this matter.

I believe that under the considerations that the Court needs to look at, that allowing the audio visual tapes to be introduced is appropriate.   However, [A.O.] would need to testify first.

¶74 Finally, the court reemphasized that the video recordings were trustworthy:

The videotape also, as I've indicated, clearly shows the understanding on the part of the child regarding the importance of telling the truth and that the content, circumstances of the statement contained within the tape on their face provide an indicia of trustworthiness.

¶75 Having ruled that the audiovisual recordings of A.O. were admissible under Wis. Stat. § 908.08, the court then addressed, presumably in response to argument from Lopez's attorney, the admissibility of the recordings as prior consistent statements:

And I believe these tapes then come in under 908.01 sub (4)(a)2, which provides that a prior consistent statement of a witness is not hearsay if the declarant testifies at trial and is subject to cross-examination; the statement is consistent with the declarant's testimony, which I assume it will be; and the statement is offered to rebut any express or implied charge against the declarant of a fabrication or improper influence or motive.

In addition to being allowed by statute, there is case law that allows the tapes to be used in that regard.   I would simply note to the parties that one of the more recent cases was Ansani vs. Cascade Mountain, Inc., at 223 Wis. 2d 39.   That's a 1998 case.

Although it is unclear whether the court's determination regarding admissibility of the recordings as a prior consistent

35

statement was proper, the fact remains that the court first properly deemed the recordings admissible pursuant to Wis. Stat. § 908.08.

¶76 The court's intent to admit the audiovisual recordings under Wis. Stat. § 908.08 can be found elsewhere in the record. During the pretrial proceedings, the court referenced the importance of conducting a timely trial so that this evidence could be admitted under § 908.08. For example, in response to a July 2009 request by Lopez's third attorney to withdraw as counsel, the court stated "I realize May of next year is still ten months away. But, at that point in time, the alleged victim in this matter would be turning sixteen, which would impact on the use of the Safe Harbor tapes." At that time, the court refused to allow further delay in the proceedings. The court's concerns regarding a delay reflect that A.O.'s sixteenth birthday would impact the admission of this evidence under § 908.08. The court's admission determination was not focused on admission of the recordings as prior consistent statements. Appellate courts are not quick to reverse a reasoned evidentiary determination of the circuit court. See, e.g., State v. Ringer, 2010 WI 69, ¶24, 326 Wis. 2d 351, 785 N.W.2d 448.

¶77 In sum, the State clearly gave notice that it sought to admit the audiovisual recordings of A.O. under Wis. Stat. § 908.08. The court made clear on the record that it deemed the recordings admissible under § 908.08. The record demonstrates that the State had every intention of introducing this powerful audiovisual evidence at Lopez's trial under that section. In

36

fact, the State introduced the recordings at Olivas' trial under § 908.08. Regardless of the court's earlier comment that the recordings "come in under 908.01 sub (4)(a)2," the court clearly deemed the recordings admissible under § 908.08, and it understood that A.O. turning 16 years old would impact their admissibility. Thus, once A.O. turned 16 years old the State's most compelling piece of evidence was no longer admissible at trial in the same way, if at all. The fact that the State would be precluded from introducing the recorded statements of the child victim under § 908.08 is of great significance to a substantial prejudice analysis.

B. Substantial Prejudice To The State

¶78 At the outset, we note that the circuit court did not decide Lopez's motion to withdraw her pleas in a vacuum. In reaching its conclusion, the court, which would be conducting the trial in this case, considered the value of the audiovisual evidence and the effect that allowing Lopez to withdraw her pleas would have on the victim and the State. Ultimately, the court concluded that substantial prejudice would befall the State if Lopez were allowed to withdraw her pleas. The court was thus in a particularly good position to reasonably conclude that "this is an absolutely clear and easy call on my part to find that if the State was not allowed to use the Safe Harbor tapes it would result in substantial prejudice to the State." We sustain the court's determination and now turn to the facts which underlie that conclusion.

37

¶79 On November 19, 2009, Lopez pled no contest to several counts. The court found her guilty and ordered a PSI. In exchange for her pleas, the State agreed to dismiss but read in 16 of the 22 counts against her. The dismissed counts could be considered for sentencing purposes. The State did not otherwise agree to any limitations regarding sentencing.

¶80 At the time of Lopez's pleas, the court had already deemed the audiovisual recordings of A.O. admissible under Wis. Stat. § 908.08, and had already discussed the need to proceed to trial before A.O. turned 16 years old. Thus the court, the State, and Lopez were all aware of the significance of having a trial before that date. Even defense counsel had acknowledged that the recordings would not be admissible once A.O. reached her sixteenth birthday.[15]

¶81 On March 19, 2010, four months after Lopez entered her pleas, she moved the court pro se to withdraw her pleas. As A.O.'s biological mother, Lopez would have known that her motion came less than two months before A.O.'s sixteenth birthday, at

---

[15] On May 18, 2010, at the hearing on Lopez's request to withdraw her pleas, the court engaged in the following exchange with counsel:

THE COURT: And do you acknowledge that under Section 908.08(3) that the State would not be allowed to use the Safe Harbor tapes at trial in this case?

[DEFENSE COUNSEL:] Because of the age?

[THE COURT:] Yes.

[DEFENSE COUNSEL:] I believe that would be the case.

which time A.O.'s age would then render her audiovisual interviews inadmissible under Wis. Stat. § 908.08. Lopez's motion also came just ten days after the PSI was filed. The PSI recommended that Lopez be sentenced to a maximum of 37 years imprisonment, with 25 years of initial confinement followed by 12 years of extended supervision. The PSI also recommended Lopez have no contact with her children. On March 18, 2010, just one day before Lopez's change of heart, Lopez's husband, Olivas, had been sentenced to 57 years imprisonment.

¶82 The contrast between Lopez's dilatory pre-trial conduct and her more recent post-plea enthusiasm for putting the State to its burden of proof at a trial does not escape our notice. While not jugular in our review of the substantial prejudice analysis, we note that Lopez's delayed request to withdraw her pleas was also commented on by the trial court on May 4, 2010. The court stated that "[t]his is clearly at this point reaching absurdity and obvious delaying and obstruction," and that Lopez "certainly did not expeditiously seek to withdraw her plea[s]." Certainly, the court understood that Lopez's PSI recommended that she receive a lengthy prison sentence and have no contact with her children, and her motion was made just one day after her husband, Olivas, had been sentenced to 57 years imprisonment. The timing of her motion at least raises a question regarding the motivation underlying her change of heart.

¶83 Specifically, in any of the approximately 13 months before she entered her pleas, Lopez had every opportunity to

39

request a timely trial.  In fact, she could have demanded, but did not demand, a speedy trial.  Wis. Stat. § 971.10(2)(a). Instead of insisting on a more expeditious trial date, the record reflects that Lopez seemed to prefer delay.  For example, on December 17, 2008, two days before her final pretrial conference, Lopez sought and received a continuance.  On January 27, 2009, Lopez's first attorney moved to withdraw as counsel at Lopez's request.  The court granted the motion.  On April 10, 2009, Lopez's second attorney moved the court to withdraw as counsel, again at Lopez's request.  The court granted the motion.  On July 7, 2009, Lopez filed a pro se motion with the court seeking to dismiss her third attorney.  On July 22, 2009, Lopez's third attorney followed up on that request by formally moving the court to withdraw as counsel. Clearly, the court believed that Lopez was seeking delay, rather than the opportunity to bring her case to trial.  When the court denied Lopez's third attorney's motion to withdraw as counsel on July 31, 2009, it stated "I don't see the delay here being for really any legitimate purpose."  Lopez ultimately entered into a plea agreement just weeks before her long delayed trial date.

¶84  Thereafter, Lopez moved to withdraw her pleas, and her third attorney moved the court to withdraw as counsel.  The court granted counsel's motion.  However, when Lopez requested that her fourth attorney withdraw on May 4, 2010, the court stated, "I'm going to deny counsel's motion to withdraw.  This is clearly at this point reaching absurdity and obvious delaying and obstruction."  The circuit court also noted that the timing

40

of Lopez's request to withdraw her pleas was suspect. The court determined that Lopez might be "using the process and the claim of misunderstanding to delay and frustrate the basic administration of justice here. She certainly did not expeditiously seek to withdraw her plea[s]." It is not unreasonable for the court to reference how the impact of these delays and the timing of the motion would cause substantial prejudice to the State if Lopez were allowed to withdraw her pleas.

¶85 Ultimately, on May 18, 2010, the court denied Lopez's motion to withdraw her pleas. Because we afford the circuit court deference when we review its determination, our focus is on the circuit court's findings and conclusions. Indeed, the record reflects that the circuit court appropriately considered the arguments of counsel, the language of the rule, the audiovisual recordings themselves, and the pertinent case law. The court did not deem the audiovisual recordings to be just one more, cumulative, piece of evidence. Instead, the court concluded they were "compelling" and that proceeding to trial without being able to admit them as Wis. Stat. § 908.08 evidence would cause the State substantial prejudice.

¶86 The test for substantial prejudice that Lopez espouses is whether the State might still be able to prove guilt beyond a reasonable doubt without admitting the audiovisual recordings under Wis. Stat. § 908.08. The test, however, is not as Lopez wishes. The test is whether the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas. The

41

substantial prejudice that would result in this case is that the State would lose the ability to admit significant, persuasive, "compelling" evidence that would otherwise have been admissible under § 908.08 at trial. The circuit court did not find Lopez's arguments compelling, and neither do we.

¶87 Simply stated, Lopez now argues that the State is not substantially prejudiced. Lopez opines that the State has enough other evidence and that the State does not need the audiovisual recordings to prove her guilty beyond a reasonable doubt. Lopez concludes that the audiovisual recordings would otherwise be partially admissible and that, in that limited form, they are sufficient. Conveniently, Lopez's defense strengthens as the quantity and quality of the State's evidence weakens. Notably, even though the recordings were played as Wis. Stat. § 908.08 audiovisual recordings at Olivas' trial, the jury in that case still returned a verdict of not guilty on three counts. Lopez's assertion that the State's case is strong enough without the § 908.08 recordings is simply not the applicable legal standard.

¶88 The plain language of Wis. Stat. § 908.08 should mean something. Section 908.08 makes no room for admission of the recordings once the child turns age 16. If audiovisual recordings could otherwise be deemed admissible and presented to the jury in the same way regardless of age, the limitations and the factors listed in § 908.08(4) would be of little

42

significance.[16] While it is true that portions of the recordings could be deemed admissible at trial, that outcome is far from certain. Even if they were so admitted, the fact remains that once A.O. turned age 16, the recordings would no longer be admissible in their entirety, both aurally and visually, without interruption and without limitation, as would have been permitted under § 908.08 pursuant to the court's ruling. No other evidentiary provision allows for these recordings to be viewed and heard by the jury in the manner envisioned under § 908.08. When the State lost the ability to introduce the recordings under § 908.08, it was substantially prejudiced.

¶89 Wisconsin Stat. § 908.08 was enacted in response to "epidemic levels of child abuse in Wisconsin." 7 Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence § 808.1, at 884 (3d ed. 2008). The purpose of the law was to "allow children to testify in criminal [proceedings] . . . in a way which minimizes the mental and emotional strain of their participation in those proceedings." Id., at 884-85; 1985 Wisconsin Act 262 § 1. If Lopez were allowed to withdraw her

---

[16] While audiovisual recordings of children that do not meet certain requirements of Wis. Stat. § 908.08 may be deemed admissible under hearsay exceptions, see, e.g., § 908.08(7), State v. Snider, 2003 WI App 172, 266 Wis. 2d 830, 668 N.W.2d 784, this does not mean that such recordings are automatically admissible, nor does it mean that the recordings would be played in the same manner as allowed under § 908.08. No guaranty of admissibility applies to the other hearsay exceptions. Audiovisual evidence admitted outside of § 908.08 would be presented in a manner consistent with the hearsay exceptions, which are not likely to permit a party to simply play the recording in its entirety for the jury.

pleas, the State could no longer admit the audiovisual recordings under § 908.08 and, thus, the purpose of the statute would be frustrated. Contrary to the purpose of the law, if Lopez were allowed to withdraw her pleas, A.O.'s "mental and emotional strain" would be maximized rather than minimized.

¶90 Conveniently, it is Lopez who now wishes to put the State to its burden to prove each and every element of the offenses charged beyond a reasonable doubt. While putting the State to its proof was her absolute right before she entered her pleas of no contest, once she entered her pleas she no longer automatically has the right to proceed to trial. See Jenkins, 303 Wis. 2d 157, ¶32. Rather, now that Lopez has entered her pleas, the court is endowed with discretion to decide whether Lopez had shown a "fair and just reason" for the withdrawal, and whether allowing her to withdraw her pleas would cause "substantial prejudice" to the State. Id., ¶2.

¶91 We conclude that the circuit court indeed applied the appropriate test to the case at issue when it stated "[it is] the State's burden to prove that allowing the defendant to withdraw her plea would result in substantial prejudice to the State." The court personally viewed the recordings and had concluded that they were admissible. The court concluded that the recordings were lengthy, compelling, timely, and credible:

> In this case the Safe Harbor tapes taken of the victim [A.O.] are lengthy. If I remember correctly they're about three-and-a-half hours long. They are compelling. The testimony in the tape is credible. It's recent to when the events occurred. The testimony is specific. Clear.

44

¶92 The circuit court considered whether the passage of time would impact A.O.'s ability to convey the same message at trial.  The State argued that the significant passage of time caused it substantial prejudice because, in part, memories fade:

> Over the nearly two years that have elapsed, or to be more accurate, 20 months that have elapsed since the recordings were made, memories do fade. Those recordings include the description of incidents that took place close to six months in some cases even before the recordings were made as the information alleges that some of this conduct was alleged to have taken place as early as April of 2008, so the incidents occurred as early as in some cases as two years ago.

The State further asserted that it would be substantially prejudiced because A.O. could not now present herself as the terribly abused child reflected in the recordings:

> Not only the issue of accuracy and accurate reflection of memory that is preserved in those tapes, but also those tapes are demonstrative of [A.O.'s] state, her physical state and her emotional state at the time that they were made.  Her demeanor, which is essential to credibility determination, which is an essential function of course of a jury, or trier of fact, are lost if we cannot present those recordings. In those recordings she looks like a terribly abused child that she was.

¶93 Seeming to track the State's argument, the court concluded that the State was substantially prejudiced because the victim would not now be able to replicate the recorded testimony at trial:

> I think there's a real risk that she has, in fact, again just given the passage of time and the clarity and specificity of her testimony there's no way that she could ever be expected to reproduce the testimony

45

she gave in the Safe Harbor tapes and she shouldn't be forced to, . . . .

¶94 In addition to the passage of time, the court reasonably considered how A.O.'s therapy would impact her ability to testify at trial, and thus prejudice the State. The State argued that A.O.'s progress in therapy meant that she would not present the same testimony at trial:

> Fortunately for her now, she's doing very well and looks great and that's not the same presentation that would be made at trial at this point in time.  It wouldn't accurately reflect how she appeared at the time and that is a substantial prejudice that the State would suffer.

¶95 The court apparently agreed with the State and concluded:

> I have to believe that part of [A.O.'s] therapy and recovery from everything that happened to her has included a need to forget somewhat, to move on, to move forward, to try to make the best of the future life in an attempt to overcome the harm that was done to her.  If she is indeed successful in her recovery and therapy, then hopefully some of the things she's already forgotten.  I hope for her sake that's the case.

¶96 The State further argued that it would be substantially prejudiced if it lost these contemporaneous recordings, as they are the most accurate testimony available:

> She was 14 years old at the time that she was found.  She was interviewed days after she was rescued and the video recordings are now close to 20 months old.  She was a child witness.  And those video recordings are precluded from being admitted because she turned 16 a few days ago.  Those video recordings are the most accurate testimony available of what happened of her view at that point in time.

46

¶97 The circuit court agreed that, given her age, A.O. would not appear to be the same victim at trial:

> The age of the victim as reflected in the tapes is significant. And today if she was forced to testify of the passage of time from when the events occurred is significant here.

¶98 Thus, the court did weigh and consider whether the State would be substantially prejudiced if it were required to rely on A.O. as a witness without being able to present the recordings under Wis. Stat. § 908.08. The court determined that these recordings were compelling and powerful. The court concluded that substantial prejudice would befall the State if it were required to proceed without being able to introduce the recordings under § 908.08. The court found that A.O. would be unable to convey the same message at trial without the § 908.08 presentation. The passage of time and the State's inability to introduce the audiovisual recordings under § 908.08 constituted substantial prejudice. The court concluded that it was "an absolutely clear and easy call" that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas. The court's conclusions regarding the impact on the victim were reasonable. Losing the ability to introduce the recordings under § 908.08 would not merely result in the same testimony being presented in a different form, but the State would be substantially prejudiced because, as the State put it: "central to this trial and central to the evidence in this case are the video recorded statements taken by detectives at Safe Harbor of [A.O.], the principal victim, . . . ." Without

47

admitting the recordings as envisioned under § 908.08, the State was left with a completely different and less compelling presentation of its evidence.

¶99 Indeed, as part of its determination regarding substantial prejudice, the court considered relevant case law, and correctly concluded that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas:

> [L]ike the finding by the trial court in the Bollig case and the Rushing case that I referred to, because the State would face substantial prejudice to not be allowed to use the Safe Harbor tapes, the defendant's motion to withdraw her plea is denied.

¶100 In Bollig and Rushing, the trial court determinations of substantial prejudice to the State were upheld by this court and the court of appeals respectively. The substantial prejudice in Bollig and Rushing did not occur because the State lost the ability to introduce an audiovisual recording of the victim taken at a time nearly contemporaneous with the alleged offenses. The substantial prejudice in Bollig and Rushing resulted from the fact that the victim's memory would likely have faded given a delay. In the case at issue, not only does the State suffer the kind of prejudice which results from a delay impacting the victim's memory, but here the State suffers the additional loss of significant, persuasive, "compelling," audiovisual evidence that would otherwise have been admitted under Wis. Stat. § 908.08.

¶101 In Bollig the defendant pled guilty to attempted sexual contact with a child under the age of 13 in violation of

48

Wis. Stat. §§ 939.32(1) and 948.02(1) (1995-96). Bollig, 232 Wis. 2d 561, ¶3. Seven months later, prior to sentencing but after having learned that he would be required to register as a sex offender, the defendant moved the court to withdraw his plea. Id., ¶¶6-7. The circuit court concluded that the defendant's misunderstanding regarding sex offender registration did constitute a "fair and just reason" for plea withdrawal. The court went further, however, to explain that even if this did constitute such a reason, the State would still be substantially prejudiced if the defendant were allowed to withdraw his plea. Id., ¶¶6-7, 31-33. The circuit court found substantial prejudice in that it would:

> soon be 2 years since the event occurred, and one, that has been a long time hanging over the head of the victim, secondly, the victim is a child, long time to expect evidence and testimony recollections to remain fresh, so that any trial that would be held at this late date might not, would not be fair to the victim, would not be fair to the state.

State v. Bollig, 224 Wis. 2d 621, 640, 593 N.W.2d 67 (Ct. App. 1999).[17]

¶102 On appeal, this court agreed that the State would be substantially prejudiced because the defendant's plea withdrawal "would hamper the victim's ability to recall pertinent events." Bollig, 232 Wis. 2d 561, ¶43. As in the case at issue, the child victim in Bollig was available to testify, but the passage

---

[17] The quotation of the trial court record is included in the court of appeals decision, but not in the opinion of this court.

49

of time would have rendered the victim's testimony less persuasive and, therefore, constituted substantial prejudice to the State. Unlike the case at issue, however, in Bollig the State did not lose the ability to introduce an audiovisual recording of the child victim under Wis. Stat. § 908.08. Here, the State would not only be prejudiced by the delay's impact on the testimony, as in Bollig, but in the case at issue, the State would also lose the ability to introduce the audiovisual recordings under § 908.08.

¶103 In Rushing the substantial prejudice to the State was not due to the State losing the ability to admit audiovisual evidence, but rather, as in Bollig, it was due to the likely impact the delay would have on the victim's testimony. The defendant in Rushing pled guilty to first-degree sexual assault of a child, contrary to Wis. Stat. § 948.02(1) (2004-05). Rushing, 305 Wis. 2d 739, ¶1. Ten months later, but still before sentencing, the defendant sought to withdraw his plea.[18] The circuit court denied the defendant's motion, concluding that allowing the defendant to withdraw his plea would cause substantial prejudice to the State. The court noted that a

---

[18] The substantial time between the entry of the defendant's plea and his plea withdrawal is accounted for by an unusual procedural issue. Two months after his plea hearing, the defendant proclaimed his innocence during the presentence investigation interview. On learning this, the circuit court vacated the defendant's plea sua sponte. Six months later, acknowledging that the vacatur was improperly entered, the court reinstated the defendant's plea. It was at this point that the defendant filed his formal plea withdrawal motion.

video interview of the child, which the State intended to introduce at trial, was "'reflective of a [sic] extremely difficult child,' who 'appeared to be very reluctant, very hard to interview, very hyperactive, very unwilling to engage in the facts and circumstances in an—any substantial way.'" Id., ¶9. Considering the passage of time, the court stated "'[w]e're now more than a year and a half away from the actual incident, and according to the affidavit provided by the State, his memory has clearly been impaired, and that's easy to understand, when one sees the videotape.'" Id. The court concluded that, despite the fact that the video recording would still have been admissible at trial, forcing the State to put this victim on the stand for cross-examination after the passage of such a substantial amount of time would constitute substantial prejudice to the State.

¶104 The court of appeals agreed, concluding that the faded memory of a victim could result in less persuasive testimony, and thus cause substantial prejudice to the State. Rushing, 305 Wis. 2d 739, ¶16. Like the case at issue, in Rushing the State had a fairly contemporaneous audiovisual recording of the victim. Unlike the case at issue, however, the State in Rushing would not have been precluded from introducing that video at trial if the defendant were allowed to withdraw his plea. Nonetheless, the court of appeals affirmed the circuit court's determination that the State would be substantially prejudiced, even though, unlike the case at issue, the State would not otherwise lose the ability to present Wis. Stat. § 908.08

51

evidence. Compare State v. Nelson, 2005 WI App 113, 282 Wis. 2d 502, 701 N.W.2d 32.[19]

¶105 In sum, the substantial prejudice to the State in the case at issue encompasses not only the same kind of prejudice found in Bollig and Rushing, but unlike those cases, the State here also loses the ability to introduce audiovisual recordings of the victim under Wis. Stat. § 908.08. Thus, the circuit court's conclusion that "this is an absolutely clear and easy call . . . to find that if the State was not allowed to use the Safe Harbor tapes it would result in substantial prejudice to the State" is quite defensible.

¶106 Here, the circuit court's determination that the State would be substantially prejudiced is reasonable, consistent with Wisconsin precedent, and supported by the record. The substantial prejudice to the State in this case would result not only from the delay and faded memory of the victim, but also the loss of significant, persuasive, "compelling," and admissible audiovisual evidence under Wis. Stat. § 908.08. The circuit court did not erroneously exercise its discretion when it

---

[19] In State v. Nelson the State alleged that it would be substantially prejudiced if the defendant were allowed to withdraw his pleas because it had "lost contact" with the victim. 2005 WI App 113, ¶19, 282 Wis. 2d 502, 701 N.W.2d 32. The State conceded that "at some point we probably would be able to locate [the victim] again." Id. The court concluded that, while the State "may have been somewhat inconvenienced" by the withdrawal of the defendant's pleas, the State "failed to meet its burden" to show substantial prejudice. Id., ¶22. These facts are dramatically different than the case at issue here.

concluded that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas.

V.   CONCLUSION

¶107 We hold that the circuit court did not erroneously exercise its discretion when it determined that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas.  We sustain the discretionary determination of the circuit court because the record reflects that it was "the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination."  Canedy, 161 Wis. 2d at 580.  Accordingly, we reverse the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶108 DAVID T. PROSSER, J. *(concurring).* This case presents issues arising from a defendant's motion to withdraw her no contest pleas before sentencing. Current law on plea withdrawal before sentencing is summed up in paragraph 61 of the majority opinion:

> "Withdrawal of a guilty plea before sentencing is not an absolute right." Jenkins, 303 Wis. 2d 157, ¶32 (citing Canedy, 161 Wis. 2d at 583). "[A] circuit court should 'freely allow a defendant to withdraw his plea prior to sentencing for any fair and just reason, unless the prosecution [would] be substantially prejudiced.'" Id., ¶2 (citing Bollig, 232 Wis. 2d 561, ¶28). "[T]he burden is on the defendant to offer a fair and just reason for withdrawal of the plea" by a preponderance of the evidence. Canedy, 161 Wis. 2d at 583-84. "[O]nce the defendant presents a fair and just reason, the burden shifts to the State to show substantial prejudice so as to defeat the plea withdrawal." Bollig, 232 Wis. 2d 561, ¶34.

Majority op., ¶61 (brackets in original).

¶109 In Jenkins, this court observed that the state did not argue that it would be substantially prejudiced by Jenkins' plea withdrawal. State v. Jenkins, 2007 WI 96, ¶2, 303 Wis. 2d 157, 736 N.W.2d 24. "Therefore, the issues are whether Jenkins had a fair and just reason to withdraw his plea and how a reviewing court should review the circuit court's denial of Jenkins' motion." Id. The Jenkins court then provided a lengthy discussion of the fair and just reason rule, including its general principles and standard of review, its evolving history, its application in general, and its application to the facts of the Jenkins case. Id., ¶¶28-91.

¶110 Here, by contrast, "The State does not argue that Lopez failed to present a fair and just reason to withdraw her

pleas." Majority op., ¶3. Thus, the majority opinion "focuses on whether the circuit court erroneously exercised its discretion in concluding that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas." Id.

¶111 In my view, three courts (including this court) have been forced to struggle with whether the defendant's plea withdrawals would substantially prejudice the State because they have tried to apply an obsolete rule. Although I join the majority opinion, I write separately to suggest that the fair and just reason rule should be reexamined and revised so that a defendant is required to meet a higher burden for plea withdrawal before sentencing than the burden under current law. The fair and just reason rule is outmoded because it fails to account for nearly a half century of criminal justice reforms and because it often has no relation to fairness toward or prejudice to the defendant who is seeking to withdraw a plea. Circumstances today are different from circumstances existing when the fair and just reason rule was adopted. The fair and just reason rule warrants reconsideration because it lacks a sound policy basis and minimizes important protections for defendants in the criminal justice system.

## I. FAIR AND JUST REASON RULE

¶112 As stated in Jenkins, 303 Wis. 2d 157, ¶¶37-41, this court adopted the fair and just reason rule in 1967. See State v. Reppin, 35 Wis. 2d 377, 151 N.W.2d 9 (1967). The rule was derived from the American Bar Association (ABA) Project on

Minimum Standards for Criminal Justice——Pleas of Guilty § 2.1 (Tentative Draft, Feb. 1967).

¶113 Most of § 2.1 dealt with the withdrawal of guilty pleas after sentencing. Section 2.1(a) of the tentative rule read in part as follows: "(a) The court should allow the defendant to withdraw his plea of guilty or nolo contendere whenever the defendant, upon a timely motion for withdrawal, proves that withdrawal is necessary to correct a manifest injustice." Id. (emphasis added).

¶114 The language in paragraph (a) included three significant words or phrases: (1) "should"; (2) "timely"; and (3) "manifest injustice." All three terms implicate judicial discretion following judicial fact-finding. The rule used "should," not "shall," signaling discretion. The rule pointed to "timely" motions to withdraw a plea, meaning that there was no admonition to the court to grant untimely motions. "Manifest injustice" was a concept requiring development, some of which the ABA spelled out in several subparagraphs of paragraph (a).[1]

---

[1] A court should allow a defendant to withdraw his plea due to a manifest injustice when the defendant proves:

    (1) he was denied the effective assistance of counsel guaranteed to him by constitution, statute, or rule;

    (2) the plea was not entered or ratified by the defendant or a person authorized to so act in his behalf;

    (3) the plea was involuntary, or was entered without knowledge of the charge or that the sentence actually imposed could be imposed; or

¶115 Paragraph (b) of the rule then provided:

> In the absence of a showing that withdrawal is necessary to correct a manifest injustice, a defendant may not withdraw his plea of guilty or nolo contendere as a matter of right once the plea has been accepted by the court. <u>Before sentence, the court in its discretion may allow the defendant to withdraw his plea for any fair and just reason unless the prosecution has been substantially prejudiced by reliance upon the defendant's plea.</u>

<u>Id.</u> (emphasis added).

¶116 The last sentence in paragraph (b) appears almost as an afterthought. The sentence clearly established more lenient criteria for plea withdrawal <u>before</u> sentencing, as though neither the state nor the defendant had much of a stake in a defendant's plea before sentencing, but the sentence did include the word "may" and the phrase "in its discretion."

¶117 In February 1968 the ABA issued an Approved Draft of the Standards Relating to Pleas of Guilty. This court applied the Approved Draft in <u>Libke v. State</u>, 60 Wis. 2d 121, 128-29, 208 N.W.2d 331 (1973) and <u>Dudrey v. State</u>, 74 Wis. 2d 480, 482, 247 N.W.2d 105 (1976), except that the court substituted the word "should" for the word "may" in each case.

¶118 In effect, the court reworded the ABA rule to read: "Before sentence, the court should allow the defendant to

---

(4) he did not receive the charge or sentence concessions contemplated by the plea agreement and the prosecuting attorney failed to seek or not oppose these concessions as promised in the plea agreement.

American Bar Association (ABA) Project on Minimum Standards for Criminal Justice——Pleas of Guilty § 2.1(a)(ii)(1)-(4) (Tentative Draft, Feb. 1967).

withdraw his plea for any fair and just reason unless . . . ." In Dudrey, the court not only removed the words "in its discretion may" but also added the adverb "freely"——e.g., plea withdrawal "should be freely granted prior to sentencing." Dudrey, 74 Wis. 2d at 482 (emphasis added).[2]

¶119 Wisconsin had a limitation, however, that did not appear in the ABA rule. In 1969 the Wisconsin Legislature revised the Wisconsin criminal procedure code. The revision created a new Wis. Stat. § 971.08(2) that read, "The court shall not permit the withdrawal of a plea of guilty or no contest later than 120 days after conviction." § 63, ch. 255, Laws of 1969. This limitation was later deemed regulatory, not mandatory, in State v. Lee, 88 Wis. 2d 239, 246-47, 276 N.W.2d 268 (1979), but the court still noted that it was not "inappropriate for the state to object to the consideration of a motion to withdraw a plea that was brought beyond the time prescribed by statutory regulation. . . . [E]ntertaining an untimely motion to withdraw a plea would ordinarily constitute an abuse of discretion." Id. at 247.

---

[2] "In 1979 the ABA standard was revised to read as follows: 'After entry of a plea of guilty or nolo contendere and before sentence, the court should allow the defendant to withdraw the plea for any fair and just reason unless the prosecution has been substantially prejudiced by reliance upon the defendant's plea.'" State v. Jenkins, 2007 WI 96, ¶40, 303 Wis. 2d 157, 736 N.W.2d 24 (quoting State v. Canedy, 161 Wis. 2d 565, 581, 469 N.W.2d 163 (1991)).

Thus, this court adopted "should" six years before the ABA, and it added the adverb "freely," which does not appear in the ABA rule.

¶120 In 1984 the legislature repealed Wis. Stat. § 971.08(2). 1983 Wis. Act 219, § 43. This removed any explicit time limitation between a defendant's plea and a defendant's sentence during which a defendant could move to withdraw a plea.

¶121 In sum, since 1967, Wisconsin law has often appeared to be moving to make it ever easier for a defendant to withdraw a plea before sentencing at the same time it was making the process of taking a plea more complex and more difficult. This inconsistency is too blatant to ignore.

## II. CHANGES IN CRIMINAL PROCEDURE

¶122 When the ABA adopted its rule on plea withdrawal in 1967, it stated that the "process [of taking pleas before a trial] has received relatively little attention as compared to the actual trial of criminal cases." ABA Project on Minimum Standards for Criminal Justice——Pleas of Guilty 5 (Tentative Draft, Feb. 1967). As a result, "the practices in cases which are disposed of without trial are far from uniform." Id. Thus, the objective of the proposed rule on plea withdrawal——designed for the entire nation——was not "to bring about a substantial shift away from the practice whereby trial-avoiding pleas are obtained and accepted. Rather, the attempt is to formulate procedures which will _maximize the benefits of conviction without trial_ and _minimize the risks of unfair or inaccurate results_." Id. at 3 (emphasis added).

¶123 Preservation of Wisconsin's "any fair and just reason rule" disregards the sea changes in criminal procedure since the late 1960s.[3] Some of these changes are noted below.

A. Defendant's Right to Counsel

¶124 Section 1.3 (Aid of counsel; time for deliberation) of the ABA's Tentative Standards Relating to Pleas of Guilty provided in part that:

> (a) A defendant should not be called upon to plead until he has had an opportunity to retain counsel or, if he is eligible for appointment of counsel, until counsel has been appointed or waived. A defendant with counsel should not be required to enter a plea if his counsel makes a reasonable request for additional time to represent the defendant's interests.

---

[3] The current state of criminal procedure makes a lenient plea withdrawal standard unnecessary. Detailed plea colloquies seemed to influence the federal rule's shift [former Fed. R. Crim. P. 32(d), present Fed. R. Crim. P. 11(d)(2)(B)] from allowing plea withdrawal unless the government could show prejudice to allowing withdrawal only if the defendant could show a fair and just reason.

> Given the great care with which guilty pleas are now taken——including placing the plea agreement on the record, making full inquiry into the voluntariness of the plea, advising the defendant in detail concerning his rights and the consequences of his plea, determining that the defendant understands these matters, and determining that the plea is accurate—— there is no reason to view pleas so taken as merely "tentative," subject to withdrawal before sentence whenever the government cannot establish prejudice.

5 Wayne R. LaFave et al., Criminal Procedure § 21.5(a), at 868 (3d ed. 2007) (internal footnote omitted). The view that pleas are merely "tentative" until after sentencing is inconsistent with contemporary practice.

¶125 These principles, which appear so fundamental today, were not <u>nationally</u> recognized until the 1960s and 1970s. It must be remembered that in <u>Betts v. Brady</u>, 316 U.S. 455 (1942), the United States Supreme Court determined that even though an indigent defendant requested counsel, the law did not require that defendants be appointed an attorney in all cases. <u>Id.</u> at 457, 473. The Supreme Court reconsidered the issue and overruled <u>Betts</u> in 1963. <u>Gideon v. Wainwright</u>, 372 U.S. 335, 339 (1963). In <u>Gideon</u>, the Supreme Court determined that a defendant has the right to an attorney, even if he cannot afford one. <u>Id.</u> at 344 ("[I]n our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. This seems to us to be an obvious truth."). The right to counsel spans the spectrum of criminal offenses for which a defendant may be imprisoned, from felony to misdemeanor, and no defendant may be imprisoned if he has been denied the right to counsel. <u>Argersinger v. Hamlin</u>, 407 U.S. 25, 37 (1972).

¶126 <u>Argersinger</u> (involving the right to counsel in misdemeanor cases) was not decided until five years after the tentative ABA rule on plea withdrawal was issued. <u>See</u> <u>id.</u>

¶127 In sharp contrast, Wisconsin has recognized a criminal defendant's right to counsel for more than 150 years. <u>See</u> <u>Carpenter v. Cnty. of Dane</u>, 9 Wis. 249 (*274) (1859). "Section 7 of art. I., of the constitution of this state, and § 2 of chap. 164, R. S., 1859, humanely and wisely provide that in all

8

criminal prosecutions, the accused shall enjoy the right to be heard by himself and counsel . . . ." Id. at 251 (*275-76); see also State ex rel. Traister v. Mahoney, 196 Wis. 113, 122, 219 N.W. 380 (1928) ("The right of any one accused of a criminal offense to be heard by counsel is guaranteed by our constitution, art. 1, sec. 7."). Carpenter determined that circuit courts have the power and the duty to appoint an attorney for a defendant who cannot afford one, and the attorney may recover his fees from the county. Carpenter, 9 Wis. at 252-53 (*277-78). The court in Carpenter reasoned that "it would be a reproach upon the administration of justice, if a person, thus upon trial, could not have the assistance of legal counsel because he was too poor to secure it." Id. at 251 (*275).

¶128 Reference in the 1967 ABA standards to the right to counsel helps to place the plea withdrawal rule in historical context. Today, failing to provide counsel to an indigent defendant or ineffective assistance of counsel to a defendant would provide compelling reasons to withdraw a plea before or after sentencing. However, these sound reasons are not present in this case.

B. Defendant's Right to Make Plea Decision

¶129 Section 3.2 (Relationship between defense counsel and client) of the 1967 ABA standards reads in part: "(a) Defense counsel should conclude a plea agreement only with the consent of the defendant, and should ensure that the decision whether to enter a plea of guilty or nolo contendere is ultimately made by the defendant."

9

¶130 In Wisconsin, the <u>decision</u> to plead guilty or no contest must be made personally by the defendant. <u>State v. Burns</u>, 226 Wis. 2d 762, 771, 594 N.W.2d 799 (1999), and normally a defendant will be asked on the record how she pleads so that her decision is expressly and personally stated on the record. As will be noted below, these principles do not help the defendant in this case.

C. Plea Questionnaire and Waiver of Rights Form

¶131 This court has attempted to assure that criminal defense attorneys conscientiously represent their clients. One effective tool is the plea questionnaire. Plea questionnaires and waiver of rights forms serve as checklists for attorneys and defendants, in an effort to provide reasonable certainty that all critical issues will be discussed during the attorney-client relationship before the defendant enters a plea.

¶132 In all probability, plea questionnaires were not widely used in the 1960s. The first reference to a plea questionnaire in a Wisconsin Supreme Court decision did not appear until 1986. <u>State v. Carter</u>, 131 Wis. 2d 69, 73, 389 N.W.2d 1 (1986) (referring to a 1983 Milwaukee County form). The Wisconsin Court Records Management Committee appears not to have developed a uniform form for the state until June of 1998.

¶133 Today's plea questionnaires are very detailed and may include parallel text in a different language to assist a defendant who is not fluent in English. The Spanish language questionnaire used by Minerva Lopez (Lopez) was first published in January 2006.

D. Comprehensive Plea Colloquies

¶134 Notwithstanding a defendant's representation by an attorney and the defendant's likely use of a plea questionnaire, this court has supplemented the plea requirements of Wis. Stat. § 971.08 and mandated an extensive, time-consuming plea colloquy, State v. Brown, 2006 WI 100, ¶35, 293 Wis. 2d 594, 716 N.W.2d 906; State v. Bangert, 131 Wis. 2d 246, 389 N.W.2d 12 (1986), to reinforce a defendant's understanding of the circumstances with respect to his case, court procedure, and the law, and to assure that any plea he makes is knowing, intelligent, and voluntary.

¶135 The Brown court hailed the importance of the landmark Bangert decision and quoted heavily from it. The Brown court explained:

> To head off postconviction hearings on plea withdrawals, the [Bangert] court said:
>
>> We reiterate that the duty to comply with the plea hearing procedures falls squarely on the trial judge. We understand that most trial judges are under considerable calendar constraints, but it is of paramount importance that judges devote the time necessary to ensure that a plea meets the constitutional standard. The plea hearing colloquy must not be reduced to a perfunctory exchange. It demands the trial court's "utmost solicitude."

Brown, 293 Wis. 2d 594, ¶33 (quoting Bangert, 131 Wis. 2d at 278-79). "Such solicitude will serve to forestall postconviction motions, which have an even more detrimental effect on a trial court's time limitations than do properly

11

conducted plea hearings." Id. (quoting Bangert, 131 Wis. 2d at 279).

¶136 Plea colloquies of great length and detail simply did not exist at the time the guilty plea withdrawal rule was adopted. Today it is counterproductive to require circuit courts to adhere to the comprehensive plea colloquy outlined in Brown and then to instruct them that plea withdrawals should be freely granted prior to sentencing for any fair and just reason.

¶137 If a defendant's plea is not knowing, intelligent, and voluntary, the plea constitutes a "manifest injustice" and the defendant may withdraw the plea before or after sentencing. If the defendant was denied the effective assistance of counsel, the defendant may withdraw the plea before or after sentencing. State v. Bentley, 201 Wis. 2d 303, 311, 548 N.W.2d 50 (1996); State v. Rock, 92 Wis. 2d 554, 558-59, 285 N.W.2d 739 (1979). Grounds for "manifest injustice" enumerated in the original ABA Project on Minimum Standards for Criminal Justice——Pleas of Guilty § 2.1 (Tentative Draft, Feb. 1967) or in the revised ABA Standards for Criminal Justice——Pleas of Guilty § 14-2.1(b)(i)(A)-(D)[4] (3d ed. 1999), and any "manifest injustice" found in Wisconsin case law justifying plea withdrawal after sentencing would permit plea withdrawal before sentencing.

¶138 In my view, the court should not permit a defendant to withdraw a plea before sentencing unless the defendant is able to prove a manifest injustice, provided that the defendant has

---

[4] The grounds for manifest injustice in ABA Standards for Criminal Justice——Pleas of Guilty § 14-2.1(b)(i)(E)-(F) (3d ed. 1999) are inapplicable under Wisconsin law.

12

been accorded the rights and procedural protections in relation to pleas that have been enshrined in our law. Our system should always seek to promote the fair treatment of defendants, but it should not be captive to manipulation by defendants.

### III. LOPEZ'S PLEA WITHDRAWAL

¶139 The facts in this case undermine the claim of a fair and just reason for the defendant to withdraw her pleas.

¶140 On October 2, 2008, the State issued a complaint charging Lopez with 15 counts of various forms of child abuse. Lopez waived the preliminary examination and was bound over for trial.

¶141 The State filed an information and Lopez was arraigned on November 3, 2008.

¶142 On July 24, 2009, the State amended the information so that Lopez was charged with 22 counts of criminal conduct related to her daughter.

¶143 On November 19, 2009, the defendant accepted a plea bargain and entered pleas of no contest to six counts of the information, namely, Counts 1, 8, 12, 15, 18, and 21. Counts 2, 3, 4, 5, 6, 7, 9, 10, 11, 13, 14, 16, 17, 19, 20, and 22 were dismissed and read in, and one sentence enhancer was dismissed.

¶144 The court conducted multiple hearings following the defendant's initial appearance. The court engaged interpreters for all these hearings. The defendant was represented by three attorneys——Taavi McMahon, Andrew Martinez, and Mark Maciolek—— all of whom spoke Spanish and all of whom sought to withdraw from the case because of alleged dissatisfaction by the

13

defendant.[5]  Attorney Maciolek represented Lopez from April 17, 2009, through her plea hearing on November 19, 2009, until March 23, 2010.  In short, Attorney Maciolek represented Lopez for seven months before Lopez entered a plea.

¶145 The defendant had more than a year to think about her case prior to her plea.  The court set a date for trial at a scheduling hearing on August 13, 2009——three months before the plea——and it informed the parties then that no further continuances would be permitted.  The defendant knew for two months before her plea that the State would be able to use the Safe Harbor videotapes of interviews with her daughter if the case went to trial.

¶146 After Judge Stuart Schwartz retired on October 2, 2009, the Lopez case was assigned to Circuit Judge Stephen Ehlke.  The defendant promptly filed a motion for substitution.  When a new judge, Nicholas J. McNamara, was assigned, he denied the defendant's motion for a 30-day extension.  The defendant suddenly pled the next day.

¶147 As noted above, Attorney Maciolek and the defendant went over a four-page plea questionnaire in Spanish as well as English.  Lopez signed the document.  She indicated that she was 33 years old, had 12 years of schooling, and had reviewed the entire document with her attorney.  She signed her name immediately below the statement: "Pido al juez que acepte mi

---

[5] Attorney Maciolek was not permitted to withdraw until well after the plea.

declaración y me declare culpable." (I am asking the court to accept my plea and find me guilty).

¶148 At Lopez's plea hearing, Judge McNamara conducted a textbook plea colloquy.[6] He read the six counts to which she pled, one at a time, and accepted the defendant's plea on each charge, asking follow-up questions to ensure that the defendant understood the implications of the pleas.

¶149 The defendant was responsive to the court's questions. She once spoke up saying that she did not understand, and the court rephrased the question. The defendant acknowledged that she had gone over the Spanish language plea questionnaire with her attorney. "[A]re you confident that you understood all of the questions and the information contained on the plea questionnaire and waiver of rights form?" the court asked. "Yes, Your Honor," she replied.

¶150 Another time, the court asked: "Right now of course you're receiving a translation. Are you satisfied with the

---

[6] At a motion hearing May 10, 2010, Judge McNamara made the following comment:

> As counsel well knows I'm not only a relatively new judge to the bench, but relatively new to the world of criminal cases. And as such I can honestly say that in such things as taking a plea, it's been my absolute effort and intention to be very conscientious about the sufficiency, the legality of the pleas that I've taken. . . . I can say in all of the pleas that I've taken since I've taken the bench, . . . I have never intend[ed] to cut corners and go quickly . . . , and I know . . . with every plea I've taken I've intended to make sure that I was technically doing everything that I was obligated to do to have a fair and sufficient plea. Not just for the record, but really in fairness to all the parties involved.

15

translation that you are receiving?" "Yes, Your Honor," the defendant replied.

¶151 There were other pertinent questions:

THE COURT: And have you entered your pleas today freely and voluntarily?

THE DEFENDANT: Yes, Your Honor.

. . . .

THE COURT: And are you satisfied that this plea is being made voluntarily, intelligently and with understanding?

MR. MACIOLEK: I am.

¶152 Four months later, on March 19, 2010, the court received a pro se motion from the defendant to withdraw her pleas. She accused Attorney Maciolek of wantonly taking advantage of her emotional distress, confusion, and disorientation, and forcing her to accept pleas without explanation. She claimed that her attorney never advised her to reject pleas if she did not fully understand the charges and penalties.

¶153 On May 10, 2010, almost six months after her pleas, the defendant's fourth attorney filed a formal motion for plea withdrawal. The motion claimed, in part:

1. That the defendant was unable to make a knowing plea as a result of the failure of previous counsel to fully explain the elements of the crime, maximum penalties, and likely outcome of the plea;

2. That during the colloquy with [the] court, the defendant was excessively compliant and overly deferential to the court to the extent that her answers were made out of respect and deference to the court rather than actual understanding of the meaning of the court's questions;

16

3. That the defendant was rushed into making a decision regarding the plea without adequate opportunity to consult and confer with people in her support network who had been supporting her and advising her since the beginning of her incarceration;

. . . .

6. As a result of one or all of the above assertions, the defendant's pleas were not intelligent, knowing, or voluntary.

¶154 The majority opinion sums up the defendant's fair and just reasons: "Lopez contended that her pleas were rushed, and that she entered her pleas unknowingly due to her limited English." Majority op., ¶3 n.2.

¶155 The defendant's contention that she did not understand what she was doing when she entered the pleas disregards both the length of time that passed between the initial charges and the plea colloquy and the extensive efforts throughout to accommodate the defendant's language deficiencies. If the court interpreters, Spanish language forms, and Spanish-speaking attorneys were insufficient, one wonders what more could have been done and what sort of disturbing precedent would be set by this case.

¶156 The claim that Lopez was "rushed" into making her pleas may find superficial support in Judge McNamara's comment that "of course all the parties know that this plea hearing came very quickly"——namely, the day after a status conference. However, the prosecutor, Corey Stephan, commented during the plea hearing that "[w]e didn't think that there was ever going to be a plea in this case."

17

¶157 In explaining to the court why the plea was in the public interest, Stephan stated:

I don't think this is letting this defendant off easy. I think that this is giving her an opportunity to accept responsibility for the offense and I think . . . any time a defendant asks for a plea agreement, I think that we're to come in and make a good faith effort to resolve the case and I will tell you that <u>this offer that we are presenting here today is substantially the same offer that has been available to her since the middle of the summer. It's just that she now wishes to accept it</u>, and there were some minor detail changes that I don't think that we need to get into here, but <u>it's substantially the same offer, nothing really changed, but she is now in a place where she wishes to accept it</u> and I think it's in the best interest of the State and the child to step forward and accept the offer on behalf of the State and to re-extend our offer.

(Emphasis added.)

¶158 There is no evidence that the defendant's attorney pressured her into entering a plea against her will, and the circuit court so found. In all probability, Attorney Maciolek counseled the defendant to reflect on the strength of the State's evidence and the possibility that contrition and remorse on her part would play better than defiance, blame-shifting, and unwarranted claims that extreme child abuse was a "family matter not criminal in nature." (<u>See</u> Defendant's Pro Se Motion filed March 19, 2010.)

18

¶159 Finally, the motions to withdraw the defendant's pleas were untimely under any reasonable standard.[7]

¶160 Judge McNamara determined that the defendant had offered a fair and just reason for withdrawing her pleas,[8] but he concluded that plea withdrawal would be substantially prejudicial to the State.

¶161 It would be hard for this court to conclude that Judge McNamara's first determination was an erroneous exercise of

[7] Judge McNamara noted that Lopez "certainly did not expeditiously seek to withdraw her plea. She waited until the trial and conviction and sentencing of her husband. She waited until approximately ten days after the Court received the presentence investigation report with a recommendation for a sentence by the Department of Corrections."

[8] Although Judge McNamara determined that Lopez established a fair and just reason for withdrawing her pleas, he astutely noted that a defendant's burden to establish a fair and just reason is quite low:

> The second aspect as to whether or not Ms. Lopez has shown a fair or just reason to withdraw her plea is a little trickier. I do believe that the law on that is at times conflicting. As was noted by Mr. Glinberg there needs to be something more than just a desire to have a trial, at the same time all of the cases really indicate that there just needs to be a mere showing or adequate reason for the defendant's change of heart. And it's clearly a relatively low burden of proof for the defendant to show that she has a fair and just reason to withdraw her plea. In the various cases such as Shanks or Libke, the kinds of things that would constitute a fair and just reason for withdrawing the plea includes an assertion of innocence, a genuine misunderstanding of the pleas' consequences, and hasty entry of the plea, confusion on the defendant's part, coercion by trial counsel, and also whether the defendant sought to withdraw the plea expeditiously or efficiently or relatively quickly.

19

discretion, given the current state of the law.  However, Judge McNamara, whose performance was absolutely superior, was trying to apply law that no longer makes any sense.

¶162 That is why the fair and just reason rule must be reconsidered.

¶163 For the foregoing reasons, I respectfully concur.

¶164 I am authorized to state that Justice MICHAEL J. GABLEMAN joins this concurrence.

¶165 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting)*. I join Justice Bradley's dissent.

¶166 I write separately to put into perspective Justice Prosser's concurrence on the continued use of the "fair and just reason" standard for withdrawal of a guilty plea prior to sentencing. The concurrence asserts that it is inconsistent to impose stringent plea colloquy requirements on circuit courts to ensure knowing, intelligent, and voluntary guilty pleas and to apply simultaneously the "fair and just reason" standard to allow withdrawal of a guilty plea prior to sentencing. Concurrence, ¶121.

¶167 This issue has not been addressed by the parties.

¶168 The concurrence's comments on the "fair and just reason" standard, in my opinion, should be read in the following contexts:

(A) National and state authorities proposing criminal procedure rules and standards have simultaneously recognized refinements to guilty plea colloquy requirements while retaining the "fair and just reason" standard for withdrawal of a guilty plea prior to sentencing;

(B) The policies favoring the "fair and just reason" standard for withdrawal of guilty pleas prior to sentencing remain salient;

(C) Wisconsin case law on the "fair and just reason" standard has evolved to meet the changing criminal procedure landscape;

1

(D) The "fair and just reason" standard supplements the defendant's remedies for arguably deficient plea colloquies under State v. Bangert, 131 Wis. 2d 246, 389 N.W.2d 12 (1986); and

(E) The concurrence advocates the manifest injustice standard to replace the "fair and just reason" standard for guilty plea withdrawal, despite the concurring justice's criticism of the "manifest injustice" standard as unclear and difficult.[1]

A

¶169 Much of the concurrence's reasoning for rejecting the "fair and just reason" standard rests upon the notion that there has been a sea change in the requirements for the colloquy before a circuit court accepts a plea of guilty since Wisconsin adopted the "fair and just reason" standard based on the ABA's 1967 standards.[2] Concurrence, ¶123.

¶170 I agree that this court should be open to reexamining case law to conform to changes in the law.

¶171 Yet entities that propose and codify rules of criminal procedure continue to urge use of the "fair and just reason" standard. See, for example, the American Bar Association's 1999

---

[1] State v. Taylor, 2013 WI 34, ¶71, 347 Wis. 2d 30, 829 N.W.2d 482 (Prosser, J., concurring).

[2] American Bar Association Project on Standards for Criminal Justice, Standards Relating to Pleas of Guilty § 2.1(b) (Approved Draft 1968); Libke v. State, 60 Wis. 2d 121, 128-29, 208 N.W.2d 331 (1973) (rejecting the manifest injustice standard in favor of the "fair and just reason" standard based on the 1967 ABA standards).

2

revised criminal justice standards,[3] the Federal Rules of Criminal Procedure,[4] the Uniform Rules of Criminal Procedure,[5] and the Wisconsin Judicial Council's most recent proposed revisions to criminal procedure.

¶172 The ABA reaffirmed its commitment to the "fair and just reason" standard when it revised its criminal justice standards in 1999.[6] This comprehensive reworking of the ABA's criminal justice standards incorporated changes in criminal procedure since 1967, including increased protections for defendants at guilty plea colloquies.[7] Nonetheless, the ABA continues to use the "fair and just reason" standard, noting that "[t]his test frequently has been applied to presentence plea withdrawal motions in the federal courts and in many state courts."[8]

---

[3] ABA Standards for Criminal Justice:  Pleas of Guilty (3d ed. 1999).

[4] Fed. R. Crim. P. 11(d)(2).

[5] Unif. R. Crim. P. 444(g), 10 U.L.A. 123 (1987).

[6] ABA Standards for Criminal Justice: Pleas of Guilty Std. 14-2.1 (3d ed. 1999) ("After entry of a plea of guilty or nolo contendere and before sentence, the court should allow the defendant to withdraw the plea for any fair and just reason.").

[7] See, e.g., ABA Standards for Criminal Justice:  Pleas of Guilty Std. 14-1.4 at 35-39 (3d ed. 1999) (historical note and commentary) (requiring that defendants understand not only the nature and elements of the offense, but also the "terms and conditions of any plea agreement").

[8] See, e.g., ABA Standards for Criminal Justice:  Pleas of Guilty Std. 14-2.1 at 85-86 (3d ed. 1999) (historical note and commentary).

¶173 The most recent version of the Federal Rules of Criminal Procedure sets forth numerous requirements for a plea colloquy prior to court acceptance of a guilty plea,[9] while

---

[9] Federal Rule of Criminal Procedure 11(b) states:

(b) Considering and Accepting a Guilty or Nolo Contendere Plea.

(1) Advising and Questioning the Defendant. Before the court accepts a plea of guilty or nolo contendere, the defendant may be placed under oath, and the court must address the defendant personally in open court. During this address, the court must inform the defendant of, and determine that the defendant understands, the following:

(A) the government's right, in a prosecution for perjury or false statement, to use against the defendant any statement that the defendant gives under oath;

(B) the right to plead not guilty, or having already so pleaded, to persist in that plea;

(C) the right to a jury trial;

(D) the right to be represented by counsel——and if necessary have the court appoint counsel——at trial and at every other stage of the proceeding;

(E) the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses;

(F) the defendant's waiver of these trial rights if the court accepts a plea of guilty or nolo contendere;

(G) the nature of each charge to which the defendant is pleading;

continuing to affirm a commitment to the "fair and just reason" standard. Federal Rule 11(d)(2)(B) states: "A defendant may withdraw a plea of guilty or nolo contendere . . . after the court accepts the plea, but before it imposes sentence

---

(H) any maximum possible penalty, including imprisonment, fine, and term of supervised release;

(I) any mandatory minimum penalty;

(J) any applicable forfeiture;

(K) the court's authority to order restitution;

(L) the court's obligation to impose a special assessment;

(M) in determining a sentence, the court's obligation to calculate the applicable sentencing-guideline range and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a);

(N) the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence; and

(O) that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

(2) Ensuring That a Plea Is Voluntary. Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises (other than promises in a plea agreement).

(3) Determining the Factual Basis for a Plea. Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea.

5

if . . . the defendant can show a fair and just reason for requesting the withdrawal."

¶174 The Uniform Rules of Criminal Procedure also use the "fair and just reason" standard,[10] despite extensive plea colloquy requirements similar to those in the ABA standards and the federal rules.[11]

¶175 The Wisconsin Judicial Council, which for over ten years has considered changes to criminal procedure, has recently proposed a bill that imposes the "fair and just reason" standard for plea withdrawal prior to sentencing, with a remedy that restores both the State and the defendant to the positions they were in prior to the plea.[12]

---

[10] Unif. R. Crim. P. 444 (g), 10 U.L.A. 123 (1987).

[11] Unif. R. Crim. P. 444(c), 10 U.L.A. 120-21 (1987).

[12] 2013 Wis. Assembly Bill 383, § 732, reads in relevant part:

SECTION 732. 971.093 of the statutes is created to read:

971.093 Withdrawal of a plea of guilty or no contest.

(1) BEFORE SENTENCING. The court shall grant a motion that is made before sentencing to withdraw a plea of guilty or no contest if a fair and just reason for doing so is established.

. . . .

(3) REMEDY. When the court grants a motion to withdraw a plea of guilty or no contest under this section, the judgment of conviction is vacated, the original charge or charges reinstated, and the parties are restored to the position they were in before the plea and any related plea agreement was accepted.

¶176 Thus, it appears that the entities and organizations that propose and codify new criminal procedure standards have not taken the concurrence's suggestion to reject the "fair and just reason" standard. On the contrary, they have repeatedly affirmed the "fair and just reason" standard for withdrawal of guilty pleas prior to sentencing.

B

¶177 Important policy rationales underlie the continued application of the "fair and just reason" standard for guilty plea withdrawal prior to sentencing: (1) judicial efficiency in reducing appeals; and (2) fairness to the defendant. These rationales have not been undermined by more rigorous plea colloquy requirements.

¶178 As the concurrence rightly notes, any standard must "formulate procedures which will maximize the benefits of conviction without trial and minimize the risks of unfair or inaccurate results." Concurrence, ¶122 (quoting American Bar Association Project on Minimum Standards for Criminal Justice——Pleas of Guilty 5 (Tentative Draft, Feb. 1967)).

¶179 Regarding the rationale of judicial efficiency, courts have noted that "[t]he liberal rule for withdrawal of a guilty plea before sentence is consistent with the efficient administration of criminal justice":[13]

- It reduces the number of appeals contesting the 'knowing and voluntariness' of a guilty plea.

---

[13] United States v. Young, 424 F.2d 1276, 1279 (3d Cir. 1970).

- It avoids the difficulties of disentangling such claims.[14]

¶180 Regarding the rationale of fairness to the defendant, the 1999 ABA commentary to its use of the "fair and just reason" standard for withdrawal of a guilty plea prior to sentencing explains that the standard balances the goals of maximizing the benefits of conviction without trial while minimizing the risks of unfairness as follows:

- The conviction is not yet final.

- The court has not taken the time to weigh an appropriate sentence.

- No appeal from the judgment is possible.

- If the defendant has second thoughts before sentencing about having pleaded guilty, this fact may suggest that the plea was entered without sufficient understanding and contemplation.

- Given the considerable care pursuant to which pleas are required to be taken, it is difficult to justify allowing a defendant to withdraw a plea without any reason at all.[15]

¶181 The ABA's reasoning for using a "fair and just reason" standard is spot-on, even if plea colloquies now better ensure knowing, intelligent, and voluntary guilty pleas.

¶182 Additionally, courts have persuasively explained a distinction between the policy for a "fair and just reason" standard for guilty plea withdrawal prior to sentencing and the

---

[14] These bullet points are stylized from Young, 424 F.2d at 1279.

[15] These bullet points are stylized from ABA Standards for Criminal Justice: Pleas of Guilty Std. 14-2.1 at 85 (commentary) (3d ed. 1999).

8

policy for a more stringent standard after sentencing. State v. Olish, 266 S.E.2d 134 (W. Va. 1980), summarizes three reasons for applying a more stringent standard for post-sentencing plea withdrawal:

- First, once sentence is imposed, the defendant is more likely to view the plea bargain as a tactical mistake and therefore wish to have it set aside.

- Second, at the time the sentence is imposed, other portions of the plea bargain agreement will often be performed by the prosecutor, such as the dismissal of additional charges or the return or destruction of physical evidence, all of which may be difficult to undo if the defendant later attacks his guilty plea.

- Finally, a higher post-sentence standard for withdrawal is required by the settled policy of giving finality to criminal sentences which result from a voluntary and properly counseled guilty plea.[16]

¶183 The Olish court's reasoning matches up with the reasoning in our case law justifying the "fair and just reason" standard for guilty plea withdrawal prior to sentencing and the more stringent standard for guilty plea withdrawal after sentencing. Our court has stated that a more stringent post-sentence standard "reflects the State's interest in the finality of convictions, and reflects the fact that the presumption of innocence no longer exists." State v. Taylor, 2013 WI 34, ¶48,

---

[16] These bullet points are stylized from the Olish case. State v. Olish, 266 S.E.2d 134, 136 (W. Va. 1980).

347 Wis. 2d 30, 62, 829 N.W.2d 482 (internal quotation marks and quoted source omitted).[17]

¶184 In trying to support its position that increased protection for defendants during plea colloquies renders unnecessary the "fair and just reason" standard for plea withdrawal prior to sentencing, the concurrence quotes 5 Wayne R. LaFave et al., Criminal Procedure § 21.5(a), at 868 (3d ed. 2007). Concurrence, ¶123 n.3. It is not clear why the concurrence refers to Professor LaFave. LaFave does not support the concurrence's position that the "fair and just reason" standard should now be discarded.

¶185 The concurrence correctly notes in its footnote 3, however, that LaFave explains that the shift in federal cases is towards a "fair and just reason" for plea withdrawal and away from an earlier view that only prejudice was at issue.

¶186 LaFave documents the gradual transition from the view espoused in United States v. Savage, 561 F.2d 554, 557 (4th Cir. 1977), that no "fair and just reason" is needed and a defendant should be allowed to withdraw a guilty plea absent prejudice, towards a more restrictive view that there is "no occasion to

---

[17] See also State v. Nawrocke, 193 Wis. 2d 373, 379-80, 534 N.W.2d 624 (Wis. App. 1995) (citing Olish, 266 S.E.2d at 136, for the policy reasons distinguishing the "fair and just reason" standard for guilty plea withdrawal prior to sentencing and the "manifest injustice" standard for guilty plea withdrawal after sentencing); 5 Wayne R. LaFave et al., Criminal Procedure § 21.5(a) (3d ed. 2007) (same). Cf. State v. Handy, 391 S.E.2d 159, 161 (N.C. 1990) (same).

inquire into the matter of prejudice unless the defendant first shows a good reason for being allowed to withdraw his plea."[18]

¶187 There is no shift by LaFave or in federal and state law away from the "fair and just reason" standard.

¶188 In fact, LaFave explicitly supports the "fair and just reason" standard for presentencing guilty plea withdrawal even in the face of plea colloquy requirements. Adopting the reasoning of the Olish case discussed above, LaFave writes: "The prevailing approach of utilizing a more demanding standard after imposition of sentence than when the motion comes before sentencing is sound."[19]

¶189 LaFave concludes that the rules governing withdrawal of a guilty plea prior to sentencing on the ground that the plea colloquy was defective do not supplant the "fair and just reason" standard. LaFave states: "[I]t is erroneous for a court to conclude 'that a defendant's reason for seeking to withdraw his plea is not "fair and just" unless the reason renders the plea invalid.'"[20]

¶190 The concurrence is not persuasive in abandoning the well-reasoned rationales (in Olish and LaFave, for example) for using a "fair and just reason" standard for withdrawal of a guilty plea prior to sentencing in the present era of more rigorous plea colloquies.

---

[18] 5 LaFave et al., supra note 17, § 21.5(a) at 868.

[19] Id. § 21.5(a), at 867.

[20] Id. § 21.5(a), at 871-72 (quoting United States v. Ortega-Ascanio, 376 F.3d 879 (9th Cir. 2004)).

11

C

¶191 Adherence to the "fair and just reason" standard is of long standing in Wisconsin law, see Libke v. State, 60 Wis. 2d 121, 128, 208 N.W.2d 331 (1973). Instead of rejecting the standard, the court has continuously applied it. Indeed, as recently as last year, Justice Prosser wrote that "[w]hen a defendant moves to withdraw his plea before sentencing, the circuit court should freely allow the withdrawal if the defendant supplies any 'fair and just reason' unless withdrawal would substantially prejudice the prosecution." State v. Taylor, 2013 WI 34, ¶62, 347 Wis. 2d 30, 829 N.W.2d 482 (Prosser, J., concurring) (citing State v. Cain, 2012 WI 68, ¶24, 342 Wis. 2d 1, 816 N.W.2d 177).

¶192 Our case law over the years has developed the contours of the "fair and just reason" standard.

¶193 The concurrence erroneously treats the "fair and just reason" standard as so low a bar that the circuit courts become "captive to manipulation by defendants." Concurrence, ¶31. Yet in practice, the "fair and just reason" standard is far from an automatic pass for defendants. "Despite the language of this standard that suggests a low burden for plea withdrawal before sentencing, the Wisconsin Supreme Court has noted the difficulty that defendants encounter in practice."[21]

---

[21] 9 Christine M. Wiseman & Michael Tobin, Wisconsin Practice Series: Criminal Practice & Procedure § 23:31, at 941-42 (2d ed. 2008) (footnotes omitted) (citing State v. Jenkins, 2007 WI 96, ¶43, 303 Wis. 2d 157, 736 N.W.2d 24).

12

¶194 For example, in State v. Canedy, 161 Wis. 2d 565, 469 N.W.2d 163 (1991), this court explicitly rejected the approach of some courts that "determined that any desire to withdraw the plea before sentence is 'fair and just' as long as the prosecution would not be prejudiced." Canedy, 161 Wis. 2d at 583. Canedy noted that Wisconsin law requires "something other than the desire to have a trial"; the defendant has the burden to prove a fair and just reason for withdrawal of a guilty plea by a preponderance of the evidence. Canedy, 161 Wis. 2d at 583-84.

¶195 In Canedy, the defendant alleged that he misunderstood the meaning of "depraved mind" and the consequences of his guilty plea, even though he entered the guilty plea after a colloquy explaining the "depraved mind" element of the crime. An appellate court uses the "erroneous exercise of discretion" standard for reviewing a circuit court's grant or denial of a defendant's motion to withdraw a guilty plea under the "fair and just reason" standard. Because the circuit court found the defendant's allegations not credible by a preponderance of the evidence, this court held that denial of the defendant's motion to withdraw his plea was not an erroneous exercise of discretion. See also State v. Kivioja, 225 Wis. 2d 271, 288-89, 592 N.W.2d 220 (1999) (holding that a "fair and just reason" must be "credible" and "plausible" and deferring to the circuit court's finding of credibility).

¶196 The court also recognized the "fair and just reason" standard as a bar to withdrawal of a guilty plea in State v.

13

_Jenkins_, 2007 WI 96, 303 Wis. 2d 157, 736 N.W.2d 24, noting that a defendant must meet two standards prior to demonstrating a "fair and just reason":

> First, the defendant must proffer a fair and just reason for withdrawing his plea. Not every reason will qualify as a fair and just reason. Second, the defendant must proffer a fair and just reason that the circuit court finds credible. In other words, the circuit court must believe that the defendant's proffered reason actually exists.

_State v. Jenkins_, 303 Wis. 2d 157, ¶43 (citations omitted) (citing _Canedy_).

¶197 In _Jenkins_, the defendant's allegations of misunderstanding were rejected as failing these requirements.[22] The _Jenkins_ court stated: "As long as circuit courts follow the court mandated and statutory requirements during plea colloquies, defendants will ordinarily have difficulty showing a fair and just reason for plea withdrawal if the reason is based on grounds that were adequately addressed in the plea colloquy." _Jenkins_, 303 Wis. 2d 157, ¶60.

¶198 Although the concurrence implies that the "fair and just reason" standard is no meaningful bar to plea withdrawal, I can find no Wisconsin Supreme Court case reversing a circuit

---

[22] _State v. Jenkins_, 2007 WI 96, ¶88, 303 Wis. 2d 157, 736 N.W.2d 24.

14

court's denial of a defendant's motion to withdraw a guilty plea prior to sentencing since <u>Libke</u>.[23]

¶199 Contrary to the concurrence's concerns, our case law has conformed the "fair and just reason" to our contemporary criminal procedure requirements for guilty plea colloquies.

D

¶200 The concurrence implies that defendants wishing to withdraw their guilty pleas prior to sentencing can use <u>State v. Bangert</u>, 131 Wis. 2d 246, 389 N.W.2d 12 (1986), which enumerates guilty plea colloquy requirements, as a replacement for the "fair and just reason" standard. Concurrence, ¶136.

¶201 Yet the concurrence fails to note that the court has made it increasingly difficult to get a <u>Bangert</u> hearing, at

---

[23] <u>See, e.g.</u>, <u>State v. Bollig</u>, 2000 WI 6, 232 Wis. 2d 561, 605 N.W.2d 199 (upholding the circuit court where it denied the defendant's motion for a new trial because of substantial prejudice to the State, even though the circuit court initially denied the motion on grounds that the defendant did not allege a "fair and just reason"); <u>State v. Kivioja</u>, 225 Wis. 2d 271, 592 N.W.2d 220 (1999) (holding that even though the circuit court applied the incorrect "manifest injustice" standard for guilty plea withdrawal prior to sentencing, the circuit court's denial of the defendant's motion to withdraw his guilty plea should not be reversed as an erroneous exercise of discretion when the new evidence admitted was deemed unreliable and therefore was not a "fair and just reason" for guilty plea withdrawal); <u>State v. Garcia</u>, 192 Wis. 2d 845, 863, 532 N.W.2d 111 (1995) (holding that the circuit court did not erroneously exercise its discretion in denying the defendant's motion to withdraw the guilty plea, deeming the defendant's reason to be incredible); <u>Dudrey v. State</u>, 74 Wis. 2d 480, 485, 247 N.W.2d 105 (1976) (requiring evidence "that the misunderstanding actually existed"); <u>State v. McKnight</u>, 65 Wis. 2d 582, 223 N.W.2d 550 (1974) (holding that the defendant's allegations were incredible because the defendant acknowledged how much time he had spent deliberating over his plea change).

15

which the defendant can show that he or she did not knowingly, intelligently, and voluntarily enter a guilty plea. Thus, Bangert cannot function as a replacement for the "fair and just reason" standard.

¶202 Bangert sets out two requirements that a defendant must fulfill to get an evidentiary hearing to demonstrate that the plea was not knowingly, intelligently, or voluntarily made:

> A Bangert motion warrants an evidentiary hearing if (1) the motion makes "a prima facie showing that [the] plea was accepted without the trial court's conformance with [Wis. Stat.] § 971.08 or other mandatory procedures," and if (2) the motion alleges that in fact the defendant did not know or understand the information that should have been provided at the plea colloquy.

State v. Howell, 2007 WI 75, ¶26, 301 Wis. 2d 350, 734 N.W.2d 48 (quoting Bangert, 131 Wis. 2d at 274) (footnotes omitted).

¶203 In recent years, however, this court has made this hearing increasingly difficult to get, even though a prima facie showing of a Bangert violation should be relatively easy to allege.[24]

¶204 In State v. Taylor, 2013 WI 34, 347 Wis. 2d 30, 829 N.W.2d 482, the defendant was denied a Bangert hearing, despite meeting all the requirements set forth in Bangert and subsequent

---

[24] "The requirements for a Bangert motion are relatively relaxed because the source of the defendant's misunderstanding, the plea colloquy defect, should be clear from the transcript of the hearing at which the plea was taken. We require less from the allegations in a Bangert motion because the circuit court bears the responsibility of preventing failures in the plea colloquy." State v. Howell, 301 Wis. 2d 350, ¶28.

16

cases.[25] *Taylor* states that when a defendant shows an "insubstantial defect" in the plea colloquy, a *Bangert* evidentiary hearing is unnecessary. *Taylor*, 347 Wis. 2d 30, ¶39.

¶205 The increased barriers to defendants to get a *Bangert* hearing make the value of a "fair and just reason" standard for presentencing guilty plea withdrawal more important, contrary to the concurrence's assertions. A defect that might not meet the current standard for getting a *Bangert* hearing might still be a "fair and just reason" justifying a guilty plea withdrawal prior to sentencing. Put differently, *Bangert* does not provide a sufficient safety net.

¶206 Similarly, in *State v. Negrete*, 2012 WI 92, 343 Wis. 2d 1, 819 N.W.2d 749, the court simply opted not to apply *Bangert* at all. *Negrete*, 343 Wis. 2d 1, ¶3. *Negrete* held that when the defendant failed to make "'a pointed showing' of an error in the plea colloquy by reference to the plea colloquy transcript," *Negrete*, 343 Wis. 2d 1, ¶20 (quoted source omitted), the *Bangert* test did not apply. *Negrete*, like many cases involving *Bangert*, involved a defendant's motion to withdraw a guilty plea after sentencing.

¶207 Although the defendant in *Negrete* asserted that the circuit court failed to inform him of collateral consequences of his plea during the colloquy, the court held that the defendant's "equivocal" affidavit in support of his *Bangert*

_____

[25] *State v. Brown*, 2006 WI 100, 293 Wis. 2d 594, 716 N.W.2d 906; *State v. Cross*, 2010 WI 70, 326 Wis. 2d 492, 786 N.W.2d 64.

motion did not demonstrate a "pointed showing of an error." Negrete, 343 Wis. 2d 1, ¶¶6, 20. The bar to get a hearing was set high; indeed the defendant in Negrete did not get a Bangert hearing. But the defendant might have made a sufficient showing of a "fair and just reason" to withdraw the guilty plea, had the defendant made his plea withdrawal motion prior to sentencing.

¶208 Thus, although Bangert provides substantial protections for defendants at plea colloquies, such protections, as LaFave explains, do not usurp all potential fair and just reasons for withdrawing a guilty plea prior to sentencing. The court's recently imposed limitations on Bangert illustrate the necessity of retaining the "fair and just reason" standard for withdrawal of guilty pleas prior to sentencing.

E

¶209 The concurrence asserts that "the court should not permit a defendant to withdraw a plea before sentencing unless the defendant is able to prove a manifest injustice, provided that the defendant has been accorded the rights and procedural protections in relation to pleas that have been enshrined in our law." Concurrence, ¶138 (emphasis added).

¶210 In Taylor, Justice Prosser urged the court "to carefully update the 'manifest injustice' test, with a comprehensive catalog of fact situations requiring withdrawal, when a defendant satisfies his burden of proof, along with citations supporting these situations." Taylor, 347 Wis. 2d 30, ¶71 (Prosser, J., concurring).

18

¶211 Justice Prosser's concurrence in the instant case seeks to replace the "fair and just reason" standard, which it perceives as unclear and difficult, with the "manifest injustice" standard, which Justice Prosser has already noted is unclear and difficult.

¶212 In sum, I join Justice Bradley's dissent and write separately to put Justice Prosser's concurrence in perspective.

¶213 ANN WALSH BRADLEY, J. *(dissenting).* The majority opinion ultimately concludes that because the videotapes would no longer be admissible under Wis. Stat. § 908.08, the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas. It maintains that without the videotapes the State would be left with a less compelling presentation of evidence due to A.O.'s loss of memory.

¶214 Its analysis, however, fails to address the argument that there was no evidence in the record supporting the circuit court's speculation or belief that A.O. suffered from memory loss. It further ignores the strong evidence against Lopez, which may still include the recordings or substantial portions of them admitted under other evidentiary rules. In essence, the majority fails to give any meaning to the word "substantial."

¶215 I am mindful of the appalling facts of this case. Nevertheless, I determine, as did the court of appeals, that neither the record nor the law supports a conclusion of substantial prejudice here. Accordingly, I respectfully dissent.

I

¶216 At the outset the majority correctly states the standard for plea withdrawal: "a circuit court should 'freely allow a defendant to withdraw his plea prior to sentencing for any fair and just reasons, unless the prosecution [would] be substantially prejudiced.'" Majority op., ¶2 (citations omitted).

1

¶217 It acknowledges that the State has conceded that Lopez presented a fair and just reason for withdrawing her pleas. Majority op., ¶3. Accordingly, it announces what is the essential issue in this case: "our analysis in this case focuses on whether the circuit court erroneously exercised its discretion in concluding that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas." Id. It follows the announcement by listing the defendant's arguments. Majority op., ¶4. Among them is Lopez's argument that "the State failed to demonstrate that the case against Lopez would be more difficult to prove." Id.

¶218 The majority later characterizes this argument as "whether the State might still be able to prove guilt beyond a reasonable doubt." Majority op., ¶86. It determines that this is not the test for substantial prejudice and proceeds to set forth its own somewhat circuitous test for substantial prejudice. It explains that the test for substantial prejudice is "whether the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas." Id.

¶219 In reaching its conclusion that there was substantial prejudice in this case, the majority quotes the circuit court's findings that the tapes were "compelling" and "credible," its belief that due to the passage of time there would be a "risk" that A.O. would not be able to reproduce the testimony she gave on the tapes, and its "hope" that with therapy some of the

2

things A.O. has forgotten. Majority op., ¶¶91-95.[1] Ultimately, the majority determines that the State would be substantially prejudiced here because "[w]ithout admitting the recordings as envisioned under § 908.08, the State was left with a completely different and less compelling presentation of its evidence." Id., ¶98.

## II

¶220 I begin by considering the purported evidence and case law that forms the basis of the majority's conclusion and examine them in light of Lopez's arguments. First, Lopez argues that the State has failed to show substantial prejudice because it offered no evidence that the victim is unable to testify or that the victim's memory has faded. Second, she contends that there is no showing of substantial prejudice because there remains significant evidence against her, including alternative grounds for the admission of significant portions of the video recordings. I address each in turn.

## A.

¶221 Absent from the majority's analysis is any evidence of record that would support its speculative conclusion that the State would be substantially prejudiced due to A.O.'s memory loss. It asserts that she would be unable to convey the same

---

[1] The majority also suggests that Lopez intentionally waited until after receiving the presentence investigation ("PSI") report to withdraw her plea and included such "dilatory" conduct in its discussion of prejudice. Majority op., ¶¶81-82. This suggestion is not supported by the record as the record indicates that Lopez had not received a copy of the PSI report prior to submitting her motion to withdraw her pleas.

message as the video recordings due to the passage of time and her therapy.

¶222 I agree with the majority that a circuit court's decision to grant or deny a plea withdrawal is entitled to deference. However, that does not mean that we simply accept the circuit court's determination. This court conducts a review which looks at whether the determination was "made and based upon the facts appearing in the record and in reliance on the appropriate or applicable law." State v. Jenkins, 2007 WI 96, ¶30, 303 Wis. 2d 157, 736 N.W.2d 24 (quoting State v. Canedy, 161 Wis. 2d 565, 579, 469 N.W.2d 163 (1991)); see also State v. Bollig, 2000 WI 6, ¶41, 232 Wis. 2d 561, 605 N.W.2d 199.

¶223 Here, there are no facts in the record indicating that A.O.'s memory has faded. The circuit court's belief or "hope" that A.O. has forgotten is not the same thing as a finding based on evidence that she has forgotten or her memory has faded. Rather than relying on evidence, both the circuit court and the majority rest on the circuit court's speculation, belief, and hope about A.O.'s therapy to conclude that she may have difficulty recalling details of what happened.

¶224 In the absence of any evidence of record, the majority relies instead on two plea withdrawal cases, Bollig and State v. Rushing, 2007 WI App 227, 305 Wis. 2d 739, 740 N.W.2d 894. I find its reliance misplaced. The majority fails to acknowledge the significant distinguishing factor in those cases. Both cases involved significantly younger victims. Bollig, 232 Wis. 2d 561, ¶¶43-46 (victim was four-and-a-half years old at the

4

time of the assault, and a motion for plea withdrawal occurred two years later); Rushing, 305 Wis. 2d 739, ¶¶2, 7 (victim was five years old at the time of the assault and defendant moved to withdraw his plea two years later). Although it may be a reasonable inference that a four- or five-year-old victim's memory would be affected by the passage of two years, that inference is much more tenuous when applied to the victim here, who was 14 years old at the time of the incidents.

¶225 In both cases there were facts of record in addition to the passage of time that supported a conclusion of substantial prejudice. In Rushing, the assistant district attorney entered an affidavit indicating that the victim's memory of the event had changed. 305 Wis. 2d 739, ¶8. In addition, the child's videotaped statement indicated that he "appeared to be very reluctant, very hard to interview, very hyperactive, very unwilling to engage in the facts and circumstances in an -- any substantial way." Id., ¶9.

¶226 In Bollig, this court likewise stressed facts of record, noting that it would be improper for the circuit court to rely on "personal assumptions." 232 Wis. 2d 561, ¶46. Relying on "the facts of the record, as well as the recognition of the effects of protracted criminal proceedings on the victim's memory" this court agreed that there was substantial prejudice. Id.

¶227 Here, the majority does not point to facts of record to support the circuit court's conclusion of substantial

5

prejudice. The absence of such evidence from the majority's discussion undermines its analysis.

¶228 Mere passage of time does not support the conclusion of substantial prejudice due to loss of memory. Neither do speculation, belief, and hope support such a conclusion. Rather, it must be based on evidence of record. Contrary to the majority, I would conclude that the circuit court erroneously exercised its discretion when it determined, without evidence of record, that A.O. suffered from memory loss and would be unable to present substantially the same information as provided in the video recordings.

B.

¶229 I turn next to Lopez's second argument, that the State failed to prove that it was substantially prejudiced because there was still significant evidence against her.

¶230 Missing from the majority's analysis is a meaningful discussion of what constitutes substantial prejudice and our relevant precedent that would inform such a discussion.

¶231 The majority's analysis of this issue consists primarily of its determination that the test for substantial prejudice is not "whether the State might still be able to prove guilt beyond a reasonable doubt without admitting the audiovisual recordings," rather, "[t]he test is whether the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas." Majority op., ¶86. However, if the State can still prove its case beyond a reasonable doubt, it is unclear how the State would be substantially prejudiced. The

6

majority's discussion does not indicate what State interest would be prejudiced and fails to clearly define substantial prejudice. Fashioning a circuitous test (the test for substantial prejudice is whether the State was substantially prejudiced) provides little illumination on the subject.

¶232 An examination of State v. Nelson, 2005 WI App 113, 282 Wis. 2d 502, 701 N.W.2d 32, would assist the majority in shedding light on what constitutes substantial prejudice. In that case, the circuit court had denied the defendant's motion to withdraw his plea because it determined that the State would be prejudiced as it had lost track of the victim. Id., ¶6. The court of appeals, however, determined that this was error because "the trial court failed to consider the strength of the State's case against Nelson." Id., ¶20.

¶233 After noting that little case law touches upon the issue of substantial prejudice, the Nelson court relied upon a dictionary definition of "substantial." Id., ¶17. ("The dictionary definition of 'substantial' includes the words 'important' and 'essential.' See Webster's Third New International Dictionary 2280 (1993)"). Noting that there was DNA evidence and that the defendant had confessed to the crimes, the court determined that even without the victim's testimony the evidence would be sufficient to find the defendant guilty beyond a reasonable doubt. Id., ¶21. Accordingly, the court concluded that although the State "may have been somewhat inconvenienced by the withdrawal," it had failed to establish substantial prejudice. Id., ¶22.

7

¶234 It is difficult to reconcile the majority's decision today with Nelson. Here, Lopez admitted much of the abuse in an interview with a detective the day after A.O. was rescued from her home. Lopez also admitted the abuse in another interview shortly after entering her plea. She admitted the abuse again when she testified at Olivas' trial. In addition to these statements, there are photographs of A.O.'s injuries and detailed medical reports. Indeed, the circuit court acknowledged that "the wounds on [A.O.]'s body alone speak to the reality of what she went through. Even if she had been killed and she had no voice left to explain what harm [Lopez] had done to her, the wounds on her body would still tell us." Further, there is no indication in the record that A.O. would be unable to reproduce her statements about the abuse.

¶235 As in Nelson, even absent the audiovisual recordings of A.O.'s statements, there is significant evidence against Lopez. Thus, it seems that any inconvenience or prejudice that the State may incur by not being able to admit the recordings under Wis. Stat. § 908.08 does not rise to the level of substantial prejudice. By concluding otherwise, the majority ignores the fact that a circuit court must find more than mere prejudice in order to deny a motion to withdraw a plea, it must find substantial prejudice.

C

¶236 In furtherance of her argument that the State was not substantially prejudiced, Lopez advances that portions of the tapes could still be shown even though admissibility under Wis.

8

Stat. § 908.08 is no longer available. Yet, the majority pays short shrift to the relevant law that would allow for the admission of the tapes.

¶237 Lopez argues, and both the majority and dissenting opinions in the court of appeals agree, that the visual portions of the tapes are not hearsay and thus need not fall under a hearsay exception in order to be admissible at trial. The majority specifically rejected the State's argument that it would be prejudiced by not being able to show A.O.'s physical conditions, noting that the State "does not explain why it would be precluded from displaying images of A.O.'s injuries without playing the audio portion of the recordings." State v. Lopez, No. 2011AP2733-CR, unpublished slip op. at 6 (Wis. Ct. App. Sept. 26, 2012). The dissent agreed with this analysis, stating that "A.O. turning 16 does not interfere with the State's ability at trial to use the video of the interviews to show A.O.'s injuries." Id. at 7 (Lundsten, P.J., dissenting).

¶238 Furthermore, Wis. Stat. § 908.08(7)[2] specifically permits the admission of audiovisual recordings of children under other relevant evidentiary rules even where the hearsay exception in Wis. Stat. § 908.08(3) does not apply. "Wis. Stat. § 908.08(7) permits the admission of a child's videotaped statement under any applicable hearsay exception regardless of whether the requirements of subsections (2) and (3) have been

---

[2] Wisconsin Stat. § 908.08(7) provides in relevant part that "a court or a hearing examiner may also admit into evidence an audiovisual recording of an oral statement of a child that is hearsay and is admissible under this chapter as an exception to the hearsay rule."

met." State v. Snider, 2003 WI App 172, ¶12, 266 Wis. 2d 830, 668 N.W.2d 784.

¶239 Lopez suggests that one such applicable hearsay exception is the residual hearsay exception in Wis. Stat. § 908.03(24). That section permits the admission of "[a] statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness." Wis. Stat. § 908.03(24).

¶240 In Snider, the court upheld the use of the residual exception to admit an audiovisual recording of a child victim's statement that did not meet the requirements set forth in Wis. Stat. § 908.08. 266 Wis. 2d 830, ¶16. There, the State sought to admit the recording after the victim testified because the victim's testimony was significantly less detailed than the account she had previously given. Id., ¶5. The defendant objected as the taped statement was not made under oath and he had not received 10 days prior notice as required by Wis. Stat. § 908.08.

¶241 On appeal, the Snider court concluded that the circuit court had appropriately considered the factors enumerated in State v. Sorenson, 143 Wis. 2d 226, 245-46, 421 N.W.2d 77 (1988), and State v. Huntington, 216 Wis. 2d 671, 687-88, 575 N.W.2d 268 (1998), and determined that the recording was admissible under Wis. Stat. § 908.03(24). Snider, 266 Wis. 2d 830, ¶19. Those factors include:

> [T]he child's age, ability to communicate and familial relationship with the defendant; the person to whom the statement was made and that person's relationship to the child; the circumstances under which the

10

statement was made, including the time elapsed since the alleged assault; the content of the statement itself, including any signs of deceit or falsity; and the existence of other corroborating evidence.

Id., ¶17 (citing Sorenson, 143 Wis. 2d at 245-46).

¶242 Here, those same factors may militate towards admission of A.O.'s recorded statements. A.O. was 14 at the time of the recordings. As the circuit court concluded, she had the age and level of development to understand the significance of the events and verbalize them. A.O. had a close personal relationship with Lopez, her mother. A.O. made the statements to a social worker soon after the events occurred. Further, the circuit court determined that A.O. clearly understood the difference between the truth and a lie and did not evince any signs of fear, guilt, anxiety, or stress. Lastly, her statements were corroborated by the medical reports of her injuries. Accordingly, based on the factors in Snider, there arguably are sufficient indicia of trustworthiness to admit the recordings under the residual exception.

¶243 Overall, the ability of the State to admit portions, if not the entirety, of the audiovisual recordings under relevant law other than Wis. Stat. § 908.08 undermines the majority's determination that the State would suffer substantial prejudice.

### III

¶244 In sum, the majority opinion, though lengthy, does very little to clarify the test for substantial prejudice. Its analysis ignores not only the lack of evidence in the record supporting its conclusion of substantial prejudice, but also the

11

strong evidence remaining against Lopez, which may still include portions, if not the entirety, of the videotapes. As a result, the majority strips any meaning from the word "substantial" as used in our substantial prejudice analysis.

¶245 For the reasons set forth above, I determine, as did the court of appeals, that the record and the law do not support a conclusion of substantial prejudice here. Accordingly, I respectfully dissent.

¶246 I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON joins this dissent.